UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| ALEXANDER GRAHAM and<br>JOSE CUEVAS | : <br> : <br> : | CIVIL NO.  3:03 CV 990 (AWT) |
| Plaintiffs, | : <br> : | |
| V. | : <br> : | |
| FIRELINE, INC. | : <br> : | |
| Defendant. | : | JUNE 15, 2004 |

**DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF MOTION TO PRECLUDE PROFFERED EXPERT TESTIMONY OF RAYMOND J. ERIKSON PURSUANT TO FEDERAL RULE OF EVIDENCE 702 AND *DAUBERT***

**I.      PRELIMINARY STATEMENT**

The Defendant, Fireline, Inc. ("Defendant" or "Fireline"), through its undersigned counsel, respectfully requests this Court to preclude the Plaintiffs, Alexander Graham ("Graham") and Jose Cuevas ("Cuevas") (collectively "Plaintiffs"), from introducing at trial the proffered expert testimony of Raymond J. Erikson ("Erikson") pursuant to Fed. R. Evid. 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) ("*Daubert*").  Specifically, but not by way of limitation, Defendant avers that: (1) Erikson is not qualified to render expert testimony regarding the design of the fused silica pour cup at issue; (2) he is unable to testify as to proximate cause; and (3) the "expert's" methodology has not been the subject of peer review or publication in the industry.  Accordingly, Erikson's proffered expert testimony is not relevant

or reliable, and thus, should be excluded. Moreover, Erikson should not be afforded any further opportunity to conduct testing or any further analysis in this matter.[1]

## II. BACKGROUND

This is a product liability case arising from an incident which allegedly occurred at Ansonia Copper & Brass ("AC&B") on June 3, 2000. AC&B is a foundry, located in Ansonia, Connecticut. AC&B manufactures wire and rods. As part of this process, metal billets, from which the wire and rods are cut, are manufactured by casters at various casting stations.[2]

At the time of the incident, Cuevas was a caster, operating Station No. 21.[3] He was in the middle of the casting process, known as a "pour," when he experienced a flash explosion of steam, allegedly caused by the contact of molten metal and water. The pour process involves the pouring of molten metal (melted in a furnace by the caster at the beginning of the pour process) into certain molds, which form the shape of the billets. The molten metal is poured through certain fused silica pour cups, manufactured by Fireline, which then distribute the molten metal through four holes in the bottom of the cups, so that the metal flows up against the walls of the molds, to create the billets. Each pour involves two cups, two molds, and results in two billets.

---

[1] Plaintiffs' deadline for disclosing an expert was January 29, 2004. Defendant has expended significant time and expense to learn and analyze the opinions of Erikson, including the taking of his deposition. To allow Erikson or Plaintiffs to conduct further analysis, which will then need to be the subject of additional discovery by Defendant would be extremely prejudicial to Defendant in this matter. Erikson's "Engineer's Report" was produced pursuant to Fed.R.Civ.P. 26(a)(2)(B), and Defendant had the right to rely on it as a reflection of Erikson's final opinions about this case.

[2] By way of illustration, a billet is a long, solid, metal cylinder, which when completed, looks like a small, metal telephone pole.

[3] Graham was Cuevas' supervisor.

As the molds are formed, they are gradually lowered into cooling tanks, which contain water, and which act to cool the molten metal, thereby resulting in the hardening of the metal into the appropriate shape.

Essentially, Plaintiffs allege that during the pour at issue, the bottom portion of one of the cups (the south cup) broke off, thereby causing an improper distribution of the molten metal, which ultimately caused the south billet to swell and break, causing the molten metal to come into direct contact with the water in the cooling tank. As all casters know, when molten metal and water come into contact, a flash explosion occurs. See Depositions of Cuevas and Graham at pp. 61-62 and 71 respectively, attached hereto as Exhibit A.

Plaintiffs commenced this suit in Connecticut Superior Court by way of a Complaint, dated May 19, 2003. On June 4, 2003, the Defendant removed this action to the United States District Court for the District of Connecticut, pursuant to 28 U.S.C. §1441(a). Plaintiffs' *single* cause of action against Fireline sounds in a purported violation of the Connecticut Products Liability Act, Conn. Gen. Stat. § 52-572m et seq. ("CPLA") in that the cup sold by Defendant was allegedly defective and/or unreasonably dangerous to the Plaintiffs and that such alleged defect caused Plaintiffs' injuries. See Complaint, ¶¶ 13-24.[4] In other words, Plaintiffs claim that as a direct and proximate result of the breaking of the cup, they were injured. See Complaint, ¶¶ 13-24.

---

[4] Plaintiffs further allege failure to warn, inadequate warnings, misrepresentation as to the safety of the product, failure to disclose the dangerous propensities of the product, failure to adequately test the product, and breach of certain implied and express warranties.

On or about June 4, 2003, Defendant filed its Answer and Affirmative Defenses ("Answer & Affirmative Defenses") to Plaintiff's Complaint. In its Answer and Affirmative Defenses, Fireline denied any and all alleged liability.[5]

Plaintiffs have disclosed Raymond J. Erikson as their sole liability expert in this case. See Exhibit B, Disclosure of Expert, dated January 29, 2004, attached hereto. According to the Disclosure of Expert, Erikson will testify as follows:

> Subject Matter: Mr. Erikson is expected to testify as to the nature and cause of the June 3, 2000 incident at casting station # 21, of the Ansonia Copper & Brass plant in Ansonia, Connecticut. He will testify as to the cause of the failure of the ceramic pouring cup, which resulted in a billet leak which thereafter caused an explosion of steam and molten metal which ultimately injured the Plaintiffs.
>
> Substance of the Facts and Opinions: Mr. Erikson is expected to testify as to his opinion based upon his review of relevant materials, that the ceramic pouring cup was made of low-density clay-based refractory ceramic; that thermal stresses can become sufficiently hight (*sic*) so as to fracture the cup; that loss of the bottom of the cup during the pouring process can lead to a disruption of the metal freezing process, and changes in the billet temperature distribution; that such changes in billet temperature distribution can lead to tearing or leaking of molten metal from the billet; and that the material from which the pouring cup was made is not suitable, in its present form, for applications such as a pouring cup.

---

[5] Defendant also asserted the following five affirmative defenses: (1) Plaintiffs' Complaint fails to state a claim upon which relief may be granted; (2) any damages purportedly suffered by Plaintiffs were caused by the negligence or other culpable conduct of third parties over which Fireline had no control, and with whom it had no relationship; (3) any damages Plaintiffs claim to have suffered were caused by the improper use and operation of the product or by the misuse of the product; (4) any damages Plaintiffs claim to have suffered were caused by the alteration, modification, and change of the product by Plaintiffs or a third party, and finally that (5) any damages Plaintiffs claim to have suffered were caused, in whole or in part, by their own negligence.

>    <u>Grounds for Opinion:</u>  Mr. Erikson is expected to testify as to his opinion based upon his review of statements given by the Plaintiffs, excerpts from an OSHA report related to the subject incident, photographs and sketches of the casting furnace set-up and layout, classifications furnished by the American Society for Testing and Materials, an exemplar pouring cup which failed (in much the same way as the subject cup) on May 7, 2003, and online data.

See <u>Exhibit B</u>.

Moreover, per the requirements of Fed.R.Civ.P. 26(a)(2)(B), Plaintiffs have offered Erikson's "Engineer's Report – Ceramic Pouring Cup Failure Analysis," dated November 3, 2003, as further evidence of Erikson's opinions.

Erikson was deposed on May 27, 2004.  During the course of this deposition, it became clear that Erikson's opinions do not rise to the level required by Fed. R. Evid. 702, or *Daubert* and its progeny.  ***More importantly, Erikson admitted that he cannot testify as to the proximate cause of the incident.***  Accordingly, Defendant now moves the court for an order precluding Erikson from testifying as an expert in this case.  Moreover, because the deadline for disclosing an expert, *with a complete opinion*, has long since passed, Defendant moves this court for an order precluding Erikson, or anyone else on Plaintiffs' behalf, from performing any further analysis in regard to this matter.

### III.    LAW & ARGUMENT

#### A.    Standard for Admissibility of Expert Testimony in Federal Court

Fed. R. Evid. 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

See *Fed. R. Evid.* 702. The "touchstone" of Fed. R. Evid. 702 is the helpfulness of the expert testimony – in other words, "whether it will assist the trier of fact to understand the evidence or to determine a fact in issue." *U.S. v. Stevens*, 935 F.2d 1380, at 1398 (3rd Cir. 1991).

With its focus upon "scientific" knowledge or testimony, *Daubert* established a two-pronged standard requiring the district court, pursuant to Fed. R. Evid. 104(a),[6] to act in a "gate-keeping" role in determining whether the proffered expert testimony is both *reliable and relevant*. See also *Saia v. Sears Roebuck & Co., Inc.*, 47 F.Supp.2d 141, 144 (D. Mass. 1999) (citing *Daubert*, 509 U.S. at 591-95). "Faced with a proffer of expert scientific testimony . . . the trial judge must determine at the outset, pursuant to Rule 104(a), whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue." *Daubert*, 509 U.S. at 593; *Saia*, 47 F.Supp.2d at 144 (providing that "whether the evidence is relevant, . . . i.e., whether it 'fits' the case, requires a determination as to whether the evidence will assist the jury in determining the existence of any fact of consequence.").

---

[6] Pursuant to Fed. R. Evid. 104(a), "preliminary questions concerning the qualification of a person to be a witness, the existence of a privilege, or the admissibility of evidence shall be determined by the court. . . . " *Fed. R. Evid.* 104(a).

Furthermore, the Court in *Daubert* set forth a four-part inquiry in which the trial judge should engage when deciphering whether the proffered expert testimony is reliable: (1) can the theory or technique at issue be tested; (2) has the theory or technique been subject to peer review; (3) does the theory or technique have a known error rate; and (4) has the theory or technique been generally accepted in the relevant scientific community. *Saia*, 47 F.Supp.2d at 144 (citing *Daubert*, 509 U.S. at 591-95). In short, the district court must "make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom, the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 265 (2d Cir. 2002) (citations and quotations omitted).

Under Fed. R. Evid. 104(a), the proponent of the expert testimony must establish, by a preponderance of the evidence, the admissibility of the proffered expert's testimony. *Johnson Elec. North Am., Inc. v. Mabuchi Motor Am. Corp.*, 103 F.Supp.2d 268, 279 (S.D.N.Y. 2000). Although there is a general presumption of admissibility in federal court, "***where a purported expert fails to meet the requirements of the Federal Rules of Evidence and Daubert, courts within the Second Circuit have not hesitated to exclude the expert's testimony at trial***." *Id.* (emphasis added); <u>see</u> <u>also</u> *Amorgianos*, 303 F.3d at 267 (noting that although the *Daubert* standard is flexible, it is "critical that an expert's analysis be reliable at every step.") Pursuant to the Federal Rules of Evidence, "the trial judge has broad discretion in the matter of the admission or exclusion of expert evidence, and his action is to be sustained unless manifestly erroneous."

*Id.* at 278 (citing *Salem v. U.S. Lines Co.*, 370 U.S. 31, 35 (1962); *Schering Corp. v. Pfizer Inc.*, 189 F.3d 218, 224 (2d Cir. 1999)).

Additionally, in *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999), the Supreme Court extended *Daubert* to encompass *all* expert testimony, as opposed to merely "scientific" expert testimony. See *Johnson Elec. North Am.*, 103 F.Supp.2d at 279. The *Kumho* Court specifically held that "*Daubert's* general holding – setting forth the trial judge's general 'gatekeeping' obligation – applies not only to testimony based on 'scientific' knowledge, but also to testimony based on 'technical' and 'other specialized' knowledge." *Saia*, 47 F.Supp.2d at 144 (citing *Kumho*, 119 S. Ct. at 1171).

**B. Erikson is Not Qualified to Proffer Expert Testimony Regarding Fused Silica Pour Cups, and Therefore, His Testimony is Inherently Unreliable and Unhelpful and Should be Precluded.**

Erikson's sole opinion in this case is that the Fireline pour cup was defective in that it was made of a material - fused silica - which is not proper for the application in use at AC&B. See Exhibit B and Dep. Tr. Or Erikson, at 99. However, Erikson does not qualify as an "expert" in the design, manufacture, or application of the fused silica pour cup at issue. Accordingly, he should not be allowed to offer expert testimony on the design of the cup or its appropriateness for use at AC&B.

In *Stolting v. Jolly Roger Amusement, Inc.*, 37 Fed. Appx. 80 (4th Cir. 2002), the defendant moved *in limine* to preclude the plaintiff from introducing the proffered expert testimony of a recreation maintenance supervisor in a negligence action based on injuries the

plaintiff allegedly suffered due to a water slide amusement park ride. [7] In affirming the granting of the defendant's motion to preclude the "expert" testimony, the Fourth Circuit found that the so-called expert was not qualified to provide expert testimony regarding the issue at hand, and that his conclusions rested on bare assumptions absent reliable support. *Id.* at 83. It noted:

> [Plaintiff] asserts that [the proposed expert's] experience as a recreation maintenance supervisor and his investigation of the [incident] are sufficient for the court to admit his proffer as an expert. [The proffered expert's] qualification to render an expert opinion in this case was, at best, dubious.[8]

*Id.*

Similarly, in *Free v. Bondo-Mar-Hyde Corp.*, 25 Fed. Appx. 170 (4th Cir. 2002), the plaintiffs brought a products liability claim stemming from the explosion of an aerosol can of paint remover. The district court granted the defendants' motion *in limine* excluding the plaintiffs' proffered expert based on the fact that the expert's opinion stemmed from his assumptions of what caused the can to explode rather than scientific, technical or other specialized knowledge. *Id.* at 172. Instead:

> The expert's opinion was based on his assumptions of what caused the can to explode rather than on scientific, technical, or other specialized knowledge. The expert appears to be an accomplished metallurgist, but he lacks knowledge of the aerosol can manufacturing process, the process of filling aerosol cans, the testing performed on cans during the manufacturing process prior to their distribution, the pressurization of the can,

---

[7] The proffered expert was experienced in constructing and maintaining all recreational facilities in the area as well as being a member of the professional organization of water park operators. **However, he had no experience as a designer or builder of water slides**. See *Stolting*, 37 Fed. Appx. at 83.

[8] For example, the court noted that the proffered expert's "qualifications" lay solely in his limited visits to the amusement park and his experience of using the ride, as well as his visual observations. The court therefore found that the proffered expert's conclusions were unsupported and unreliable. Certainly, the investigation by the proffered expert in Stolting was more detailed than that performed by Erikson in this case, where Erikson has not even visited AC&B. See Erikson Dep., attached hereto as Exhibit C, at p. 24, lines 11-12.

>or the normal pressure expected of this type of can.  **Accordingly, he lacked the expertise necessary to determine (1) whether certain scratches on the interior of the can were defects or simply normal consequences of the manufacturing process and (2) whether those scratches actually caused the explosion.  Because the expert's testimony is based merely on his belief and speculation and is therefore not reliable, the district court did not abuse its discretion in excluding his testimony**.

*Id.* (emphasis added).

Similarly, in the matter at bar, the proffered "expert" is not qualified as to the design, manufacturing, or application of the pour cups at issue.  Specifically, Erikson is not qualified to offer expert testimony regarding whether the pour cup in this case was defective.

Erikson's own sworn testimony demonstrates his lack of qualifications to testify in this case.  For example, Erikson has specifically testified as follows:

>Q: And are you an expert at this point in time with respect to the design and manufacture of parts that are made of fused silica?
>
>A: No, I wouldn't present myself as an expert.
>
>Q: Are you an expert with respect to the processes that are used to develop fused silica for parts that could be used for any purpose?
>
>A: No, I wouldn't present myself as an expert.
>
>Q: Are you an expert with respect to fused silica in the development of a pour cup such as the one involved in this matter?
>
>A: I wouldn't present myself as an expert in designing pour cups, no.
>
>Q: Would you be an expert with respect to the manufacturing of pour cups such as the one involved in this matter?
>
>A: No.

Q: Are you an expert with respect to foundry operations?

A: I wouldn't present my self as an expert in foundry operations.

Q: Have you ever worked in a foundry similar to Ansonia Copper & Brass?

A: I have not worked in a foundry similar to Ansonia Copper & Brass, but I do have some foundry experience.

Q: Have you ever been to Ansonia Copper & Brass?

A: I have not.

Q: Have you ever been to a foundry similar to Ansonia Copper & Brass?

A: I don't think I have ever visited a foundry that used the kind of downcasting process that Ansonia employs in producing their billets.

Q: Are you an expert with respect to the downcasting used?

A: I would have to say that never having been in a foundry that uses the downcasting process, the chances of my being considered an expert are fairly slim.

Q: So then it would be fair to say that you're not an expert with respect to the downcasting process used by Ansonia Copper & Brass?

A: Yes, it would be fair to say that.

See Dep. Tr. of Erikson, at pp. 23-25.[9]
* * * *

Erikson is admittedly not an expert with respect to the material at issue – fused silica. He is admittedly not an expert as to foundry operations. In fact, not only has he never visited

---

[9] Defendant has attached all relevant portions of Erikson's deposition as Exhibit C.

AC&B, he has never even been to a foundry *similar* to AC&B. He is simply not qualified to render "expert" testimony regarding the alleged defect in the Fireline pour cup.[10]

### C.  Erikson Is Not Prepared to Testify as to Proximate Cause.

**The most significant gap in Erikson's opinions is the fact that he cannot testify that the alleged defect was a proximate cause of the incident at issue.** In his report, he has provided seven "ways a direct-chill (DC) billet-casting operation can go awry. . . ." See Report, attached hereto as Exhibit D. At his deposition, Erikson testified that these seven points are merely possible causes of the Plaintiffs' incident. See Dep. Tr. of Erikson, at pp. 81 – 82. *In fact, Erikson was never even asked to determine whether there was a defect in the pour cup, and if so, whether said defect was a proximate cause of the incident.* He testified as follows:

> Q: And what you've done in your report is you listed a number of things that could cause a steam explosion?
>
> A: Correct.
>
> Q: And, as you've already testified, you don't know what the actual cause of the steam explosion was in this matter, correct?
>
> A: No, I don't know which particular sequence of events led to the leakage of metal and the steam explosion.

---

[10] Strikingly, Erikson admits that his opinion is merely an "educated guess." See Dep. Tr. Of Erikson, at 31. He does not know the actual chemical composition of the pour cup, or the process by which the pour cups are manufactured – information he admits could change his opinion in this case. See Dep. Tr. Of Erikson, at 28-31.

* * * *

> Q: My question is very simple. You were never asked to determine whether or not a broken pour cup was a proximate cause of the plaintiff's injuries; is that correct?
>
> A: That's correct.

(emphasis added). Dep. Tr. of Erikson, at pp. 105 – 108.

> In fact, Erikson specifically testified that he has no opinion as to proximate cause.
>
> Q: Mr. Erikson, do you have an opinion as to whether or not the incident giving rise to the lawsuit that we're here on was a direct and proximate result of the pour cup breaking?
>
> A: No, I do not.[11]

(emphasis added). Dep. Tr. of Erikson, at pp. 128 – 129.

Clearly, this purported "expert" is not qualified to render expert opinions regarding the issues in this case – whether the pour cup was defective and whether such defect caused Plaintiffs' alleged injuries. As his own testimony makes clear: (1) Erikson is admittedly not qualified as an expert in fused silica materials or the AC&B application at issue,[12] and most significantly, (2) Erikson has no opinion as to the proximate cause of this incident.[13] In fact,

---

[11] This testimony is especially significant given the allegation that "[a]s a direct and proximate result of the breaking of the casting cup, the Plaintiff[s] suffered numerous and painful physical injuries. . . ." See Complaint, ¶¶ 15, 20. Failure to prove this essential allegation is the death knoll to Plaintiffs' products liability claim.

[12] See Dep. Tr. Of Erikson, at 23-25. Moreover, Erikson has not conducted testing in relation to the pour cup or this particular application, nor does he have any real knowledge or expertise as to either – instead, he has made an "educated guess." See Dep. Tr. Of Erikson, at 28-33. He also admits that more testing and analysis are necessary in order for him to render an opinion to a reasonable degree of scientific certainty. See Dep. Tr. Of Erikson, at 40-41.

[13] See Dep. Tr. of Erikson, at pp. 128 – 129.

Erikson's opinion is based upon the "bare assumption" that the cup actually failed – an assumption for which there is no evidence[14]

There is no doubt – Erikson is not qualified to testify as an expert in this case. See *Stolting,* 27 Fed. Appx at 83, and *Free*, 25 Fed. Appx at 172.

    **D.**    **Erikson Has Not Subjected His Conclusions to Peer Review, or Been Published in this Area; Consequently, His Opinions Will Not Assist the Court in this Case**.

In addition to Erikson's lack of qualifications and testing in this case, he has not subjected his hypothesis (that fused silica was an inappropriate material to use in this application) in this case to peer review, and he does not know whether these conclusions are generally accepted in the relevant scientific or technical community as provided under *Daubert*.

Indeed, when questioned about his standing, or lack thereof, in the area of fused silica and its uses, Erikson stated:

    Q:    Mr. Erikson, have you published any articles with respect to the properties of fused silica?

    A:    No.

    Q:    Have you ever done any original research that's been reported anywhere with respect to the properties of fused silica?

    A:    No.

---

[14] Erikson admittedly has no evidence that the cup failed, let alone that the failure was a proximate cause of the incident. See Dep. Tr. of Erikson, at pp. 93 – 94. In fact, both Cuevas and Graham specifically testified that they did not see the cup fail during the pour at issue. See Dep. Tr. of Cuevas, at pp. 60 – 61; Dep. Tr. of Graham, at pp. 63 – 64.

> Q: Have you ever provided any lectures at any seminars, programs, colleges, universities, or anywhere with regards to fused silica?
>
> A: No.
>
> Q: Have you ever taught any courses at any time with respect to the properties of fused silica?
>
> A: No.
>
> Q: Are you an expert with respect to the properties of fused silica?
>
> A: No.

See Dep. Tr. of Erikson, at p. 124.

The only issues in this case are whether the pour cup used by Cuevas was defective and whether such alleged defect caused the Plaintiffs' claimed injuries. Plaintiffs' "expert" was disclosed to testify "as to the nature and cause of the June 3, 2000 incident. . . ." See Exhibit B. However, Plaintiffs' "expert" is unable to offer reliable and/or helpful testimony regarding whether the pour cup was defective in its design because it was manufactured out of fused silica, and more importantly, he has no opinion at all as to whether a defectively designed pour cup was the proximate cause of the Plaintiffs' alleged injuries.

Any testimony offered by Erikson would not be based upon sufficient facts or data and would not be the product of reliable principles and methods. Moreover, Erikson has not applied any principles and methods reliably to the facts of this case. See Fed. R. Evid. 702. In short,

Erikson's testimony will provide absolutely no assistance to this court. Accordingly, his testimony should be precluded.

## IV. CONCLUSION

WHEREFORE, and for the foregoing reasons, Defendant, Fireline, Inc., respectfully requests that the Court preclude Plaintiffs from introducing the testimony of their proffered expert in this case. Moreover, Plaintiffs initiated this lawsuit and have the burden of proof, and as their deadline for putting forth a reliable, complete expert opinion has passed, Erikson should be precluded from conducting any further testing, and Plaintiffs should be precluded from relying upon any other experts, not previously disclosed.

THE DEFENDANT
FIRELINE, INC.


By ___/s/ Charles F. Gfeller___
Mark B. Seiger, Esq.
Fed. Bar No. ct 05580
Charles F. Gfeller, Esq.
Fed. Bar No. ct 18119
EDWARDS & ANGELL, LLP
90 State House Square
Hartford, Connecticut 06103
(860) 525-5065
Telecopy (860) 527-4198

- 18 -

## **CERTIFICATION**

      This is to certify that on the 15th day of June, 2004, a copy of the foregoing has been mailed via First Class U.S. Mail, postage pre-paid, to:

Thomas A. Virgulto, Esq.
Mongillo, Insler & Virgulto, P.C.
26 Elm Street
New Haven, CT  06510

                                          /s/ Charles F. Gfeller
                                          Charles F. Gfeller

_136666_1.DOC/