UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT



\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

ALEXANDER GRAHAM and          \*

JOSE CUEVAS,                 \*

         Plaintiffs       \*   Civil No.:

     vs                   \*   3:03 CV 990 (AWT)

FIRELINE, INC.,            \*

         Defendant        \*

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

DEPOSITION OF RAYMOND J. ERIKSON

Taken pursuant to Federal Rules of Civil Procedure 30
and 34, held at the law offices of EDWARDS & ANGELL,
90 State House Square, Hartford, Connecticut, before
Cynthia Trotta, a Registered Professional Reporter and
a Notary Public in and for the State of Connecticut, on
THURSDAY, MAY 27, 2004, at 10:10 a.m.

BEECHER & HORVATH

A P P E A R A N C E S :


ATTORNEY FOR THE PLAINTIFFS:

    MONGILLO, INSLER & VIRGULTO, P.C.
       26 Elm Street
       P.O. Box 415
       New Haven, Connecticut  06502
       BY:  THOMAS A. VIRGULTO, ESQ.


ATTORNEYS FOR THE DEFENDANT:

    EDWARDS & ANGELL, LLP
       90 State House Square
       Hartford, Connecticut  06103
       BY:  MARK B. SEIGER, ESQ.
           CHARLES F. GFELLER, ESQ.


ALSO PRESENT:

    TERRENCE D. NEUMEYER, Westfield Group


BEECHER & HORVATH

## S T I P U L A T I O N S

IT IS STIPULATED by the attorney for the Plaintiff and the attorney for the Defendant that each party reserves the right to make specific objections in open court to each and every question asked and the answers thereto given by the witness, reserving the right to move to strike out where applicable, except such objections as to the form of the question, which would be stated during the course of the deposition.

IT IS STIPULATED AND AGREED among counsel for the parties that the proof of the authority of the Notary Public before whom this deposition is taken is waived.

IT IS STIPULATED AND AGREED among counsel for the parties that the reading and the signing of the deposition is not waived.

IT IS STIPULATED AND AGREED TO among counsel for the parties that any defect as to the notice for the deposition is waived.

4

1       R A Y   E R I K S O N ,

2       having been first duly sworn by Cynthia Trotta, a Notary

3       Public in and for the State of Connecticut, testified

4       upon his oath as follows:

5

6    DIRECT EXAMINATION

7    BY MR. SEIGER:

8       Q    Mr. Erikson, as I introduced myself to you a

9    little while ago, I'm Mark Seiger, along with Charles

10   Gfeller; we represent Fireline in a case filed by Alexander

11   Graham and Jose Cuevas.

12          If there's any question I ask you today that you

13   don't understand, please let me know immediately so we can

14   rephrase that question because the purpose of today is to

15   get a clear record that's accurate and complete.  Okay?

16       A    I understand.

17       Q    All right.  I'm going to also ask that you try to

18   answer all questions verbally because "Uh-huhs," nods of the

19   head, shrugs of the shoulders, things like that, don't show

20   up on the transcript.  So we really need a verbal response,

21   and "Uh-huhs" are difficult to figure out what the witness

22   meant.  So if you could say "Yes" or "No" instead of

23   "Uh-huh" or "Uh-uh," that would be much better for us.

24       A    I understand.

BEECHER & HORVATH

1       Q       So your involvement was really with how do you

2   bond or better bond the tile to the shuttle itself?

3       A       That was part of it.  Another thing I worked on

4   was involvement of advanced felt, reuseable insulation,

5   which was really a misnomer because it was made out of

6   quartz silica fibers to place the Nomex felt and white tiles

7   on much of the shuttle, which we did on the -- to a little

8   bit on Challenger and then a much greater extent on later

9   shuttles.

10      Q       And are you an expert at this point in time with

11  respect to the design and manufacture of parts that are made

12  out of fused silica?

13      A       No, I wouldn't present myself as an expert.

14      Q       Are you an expert with respect to the processes

15  that are used to develop fused silica for parts that could

16  be used for any purpose?

17      A       No, I wouldn't present myself as an expert.

18      Q       Are you an expert with respect to fused silica in

19  the development of a pour cup such as the one involved in

20  this matter?

21      A       I wouldn't present myself as an expert in

22  designing pour cups, no.

23      Q       Would you be an expert with respect to the

24  manufacturing of pour cups such as the one involved in this

1    matter?

2         A    No.

3         Q    Are you an expert with respect to foundry

4    operations?

5         A    I wouldn't present myself as an expert in foundry

6    operations.

7         Q    Have you ever worked in a foundry similar to

8    Ansonia Copper & Brass?

9         A    I have not worked in a foundry similar to Ansonia

10   Copper & Brass, but I do have some foundry experience.

11        Q    Have you ever been to Ansonia Copper & Brass?

12        A    I have not.

13        Q    Have you ever been to a foundry similar to

14   Ansonia Copper & Brass?

15        A    I don't think I have ever visited a foundry that

16   used the kind of downcasting process that Ansonia employs in

17   producing their billets.

18        Q    Are you an expert with respect to the downcasting

19   used?

20        A    I would have to say that never having been in a

21   foundry that uses the downcasting process, the chances of my

22   being considered an expert are fairly slim.

23        Q    So then it would be fair to say that you're not

24   an expert with respect to the downcasting process used by

1    Ansonia Copper & Brass?

2        A    Yes, it would be fair to say that.

3        Q    Rather than go through all of your

4    responsibilities at your various employers, could you

5    describe for us any other employment that encompassed the

6    use of fused silica that you've had?

7        A    Well, fused silica might sound exotic and

8    technical, but it's really quite common.  It's employed in

9    all sorts of common materials and common processes, so I

10   would have to say that everything on my resume involved

11   fused silica at some extent.

12       Q    Could you tell us any experience that you have in

13   designing parts using fused silica?

14       A    Okay.  My most recent experience using fused

15   silica would have to be the optical elements on various

16   space craft.

17       Q    When was that?

18       A    It's a continuous.

19       Q    And what's your involvement with respect to those

20   optical elements?

21       A    There's a host of materials specification,

22   development, and processing issues that need to be addressed

23   in order to fly anything and that certainly applies to the

24   optical elements that form various sensor systems.

1    into a larger solid.  Where did you want to go with this

2    question?

3        Q    I'm just asking you whether the composition of

4    what goes into the product that gets fused can have an

5    effect or an impact on the end product.

6        A    Yes.

7        Q    And you can add different chemicals or different

8    ingredients into what's going to be fused?

9        A    Just like baking a cake.

10       Q    So you would need to -- in order to analyze what

11   the finished product is, you need to know what the

12   ingredients were that went into that finished product?

13   Would that be a fair statement?

14       A    Yes.

15       Q    So depending upon what the ingredients are, the

16   results could be different on the strength of that product

17   or the performance of that product?

18       A    Yes.

19       Q    And how about the way that they actually go about

20   fusing the ingredients to cause that fusion?  Can that have

21   an impact on the characteristics of finished product?

22       A    I think what you're trying to ask me is, could

23   the way that your client, Fireline, centers together the

24   fused silica, the silica dioxide grains into a finished

1   product, could that have an effect on the final product's

2   performance, and the answer is obviously yes.

3        Q    Do you know anything about the process used by

4   Fireline?

5        A    A little bit.

6        Q    You just know a little?  You don't know the

7   entire process?

8        A    I don't have their process specifications in

9   front of me.  I don't know exactly what they do.

10       Q    Is that something that's important to you in

11  rendering an expert opinion in the case?

12       A    It would be very helpful, yes.

13       Q    Helpful in what way?

14       A    Because as we've already discussed, the process

15  is a very large part of what produces the final product, the

16  process, the composition.

17       Q    So the process can have an impact on the

18  characteristics of the finished product?

19       A    Correct.

20       Q    And the ingredients can have an impact on the

21  final characteristics of the product?

22       A    Correct.

23       Q    And as you sit here today, you've rendered an

24  opinion in this case without knowing the process used by

1    Fireline; is that correct?

2         A    Yes.

3         Q    And you recognize that the process used by

4    Fireline could change your opinion or have an effect on your

5    opinion?

6         A    What the process would change would be the

7    properties of the finished product.  That's really what

8    we're concerned about.

9         Q    Okay.  Do you know the exact ingredients used in

10   the pour cup that's involved in this case?

11        A    I have a fair idea based on the analysis

12   performed at Analytical Answers.

13        Q    I'm not asking for a fair idea.  My question was,

14   do you know the actual ingredients, the quantities of each

15   ingredient or proportions of ingredients used in

16   manufacturing the pour cup that you've analyzed in this

17   case?

18        A    I know what we analyzed.  I don't know what their

19   specification calls for.

20        Q    Based on the analysis that you did, do you know

21   the actual ingredients that are used to prepare or produce

22   the pour cup that you looked at?

23        A    Yes, we have a pretty good idea.  You can't --

24   you can't for certain from the EDS --

```
 1        Q      I'm not asking you whether you have a pretty good
 2   idea.   I'm asking you, do you know?
 3        A      I do not know.
 4        Q      Thank you.  So to a certain extent you're
 5   guessing at what the chemical composition is of a pour cup?
 6        A      That's correct.
 7        Q      Is that good science, to guess?
 8        A      That's all I have to work with right now.
 9        Q      That's not my question, sir.  My question is, is
10   that good science to guess, yes or no?
11        A      All right.  I believe --
12        Q      That can be answered yes or no, sir.  It's not a
13   difficult question.
14        A      Well, all right.
15        Q      Is it good science to guess?
16        A      Yes.  It's part of the scientific process.
17        Q      Guessing is part of the scientific process?
18        A      Hypothesize.
19        Q      But there's ways to proving a hypothesis?
20        A      That remains to be done.
21        Q      You haven't proven the hypothesis?
22        A      That's correct.
23        Q      At this point it's a guess?
24        A      It's a hypothesis.
```

1    Q    Which is nothing more than a fancy way of saying
2    a guess, an educated guess?
3    A    Yes, an educated guess.  I have made an educated
4    guess or a hypothesis.
5    Q    Did you also make an educated guess in terms of
6    what the processing was of the ingredients by Fireline in
7    preparing the cup?
8    A    I didn't really explore that in depth, no.
9    Q    So you don't even have a hypothesis in terms of
10   how Fireline went about producing the cup, the processes
11   used by them; is that correct?
12   A    That didn't enter into my current analysis.
13   Q    Yet you've already acknowledged that the
14   processing used by a company like Fireline could have an
15   impact on the final characteristics of the product?
16   A    Yes.
17   Q    And you don't know what impact the processing
18   used by Fireline actually had on these pour cups, do you?
19   A    Not yet.
20   Q    You understand that an expert report or expert
21   disclosure was done in this case on what your expert opinion
22   is?
23   A    Excuse me?
24   Q    Okay.  Plaintiffs' counsel in this case produced

1    to the Court disclosure of your expert opinion.

2         A    Okay.

3         Q    Were you aware of that?

4         A    No.

5                   MR. SEIGER:   Why don't we mark this as

6              Defendant's Exhibit 9.

7                   (DEFENDANT'S EXHIBIT 9 FOR IDENTIFICATION,

8              RECEIVED AND MARKED.)

9    BY MR. SEIGER:

10        Q    I'm going to show you what's been marked as

11   Defendant's Exhibit 9 for identification and ask you if

12   you've had an opportunity to see that before.

13        A    Well, I haven't seen this particular document

14   before, but there's nothing here that's out of line.

15        Q    Well, this is your expert opinion that you're

16   going render to the Court.

17        A    Okay.

18        Q    That's what's been represented.

19        A    There's no problem with that.

20        Q    Okay.  Yet you're telling us that these are

21   hypotheses at this point?

22        A    No.  My opinion is based on the information that

23   I have, and I don't really need to know about their process

24   to arrive at a conclusion.  We have American Society for

1     A    No, I can't present myself saying 100 percent

2    certain.  You never know with 100 percent certainty

3    anything, and that's an unreasonable request to make.

4     Q    All I'm trying to do, sir, is focus on the report

5    that you've rendered and understand what you did to prepare

6    it.  It seems to be your -- or you seem to be telling us you

7    still have more things you want to do in this case, yet

8    you've already represented to the Court that you have your

9    expert opinion and that is it.  That's your representation

10    that you've made?

11     A    Can I see that report for a moment?  I think if

12    you go back here under "Findings," we start right off with,

13    "Within the bounds of reasonable technical certainty and

14    subject to change if additional information becomes

15    available, it is my opinion that . . . "

16     Q    Thank you.  So you recognize then with the way

17    you've prepared your report that your opinions could change

18    as you get additional information beyond the date that you

19    rendered this opinion?

20     A    Yes.

21     Q    Okay.  So you haven't even finished your work in

22    this case; is that correct?

23     A    That's correct.

24     Q    In order to stand behind your opinion to a

```
 1    reasonable degree of scientific certainty, you have
 2    additional work you need to do?
 3         A    That's correct.
 4         Q    Are you aware that there was a cutoff in this
 5    case for rendering the expert opinion?
 6         A    I don't think that falls within the bounds of my
 7    job responsibility.
 8         Q    Okay.  But if what you're telling us is that you
 9    realize that there's additional information out there with
10    respect to this particular case, that may change this
11    opinion?
12              MR. VIRGULTO:  Objection.  That's been asked
13              and answered about four times.
14         A    I think if we look at Exhibit 4, the letter that
15    I sent to Attorney Virgulto, I described some of the
16    additional testing and analysis that I had hoped to do prior
17    to testifying.
18         Q    And you sent this letter dated November 3 of 2003
19    to Attorney Virgulto; is that correct?
20         A    That's correct.
21         Q    Okay.  And since November of 2003 and today,
22    which is May 7 of 2004, you haven't done this additional
23    testing, have you, sir?
24         A    That's correct.
```

1    between the inside wall of the pour cup and the outside wall

2    of the pour cup, you recognize that there are a number of

3    factors that can influence how fast that heat exchange

4    takes?

5        A    Yes.

6        Q    And as you sit here today, you don't know what

7    effect those other factors would have as regards to that

8    heat transfer between the inside wall of the pour cup and

9    the outside wall of the pour cup?

10       A    Well, I know what effect each factor would have.

11   I just don't know what the magnitude of those effects are.

12       Q    And what would you have to do to determine the

13   magnitude of those effects?

14       A    I would have to have -- well, okay.  The simplest

15   way to determine what the temperature gradient is between

16   the inside and outside is simply place a thermal cup on

17   outside of pouring cup while metal is being poured through

18   it.  Just measure it.  Short of that, I would have to gather

19   more materials property data and build a more sophisticated

20   math model.

21       Q    Let's go back to your report, and you can open

22   page 3 of that report, which is your analysis.  And on page

23   3, the analysis starts off with this statement, "There are a

24   number of ways a direct, hyphen, chill, paren., DC, close

1    paren., billet casting operation can go awry."

2         And I take it that what you were trying to do was

3    lay out alternative causes for what happened to the

4    plaintiffs in this case?

5         A    Yeah.  These are some of the ways that saw that

6    you could have the results that were observed develop.

7         Q    All right.  And when you say "the results that

8    were observed," you're talking about the molten metal

9    spraying out and getting on these individuals?

10        A    I wasn't so concerned about the personnel side of

11   the equation as to just how the metal would get out of the

12   pouring operation in the first place.

13        Q    Okay.  And did you list these in any type of

14   order that would indicate a significance to the way you

15   listed them?

16        A    You mean a higher probability of occurrence?

17        Q    Correct.

18        A    No.

19        Q    And are there additional ways this could have

20   occurred other than the seven ways you've listed here on

21   page 3?

22        A    I've endeavored to be comprehensive, but I'm sure

23   there's some other way that a system can fail that I haven't

24   listed.

1    Q    So as you sit here, you don't actually have

2    physical evidence to show you that there was a failure of

3    the pour cup, do you?

4    A    Obviously not.

5    Q    Okay.  And if Mr. Cuevas didn't observe the pour

6    cup fail as he was using it, then you still don't have any

7    evidence of a failure; isn't that correct?

8    A    My --

9    Q    Can you just answer my question?  I don't want

10   you to think beyond my question right now.

11   A    I'm sorry, it's hard to stop thinking.

12   Q    Let me just pose this question.  First of all,

13   you don't have physical evidence of a failure because you

14   don't have the pour cup that was used on the date of the

15   incident, correct?

16   A    You're talking like a lawyer, Mr. Seiger.

17   Q    I am a lawyer.  Can you please just answer my

18   question?

19   A    I was given the impression that we had a pour cup

20   failure.  I started my analysis from that point.  I am not

21   going to go back and debate whether or not there was a pour

22   cup failure because that's irrelevant to anything I've done

23   here.

24   Q    Let's start with, where did you get the

1    information that there was a pour cup failure?

2         A    I presume I received that information either from

3    my office manager, Ralph Ridgeway, at Robson Lapina and/or

4    from Mr. Virgulto.

5         Q    Okay.  Do you know where they got that opinion or

6    that information?

7         A    No, I did not hire a private investigator to go

8    trace that down.

9         Q    Okay.

10        A    That's well beyond my scope of work.

11        Q    So it's clear you relied on somebody else to tell

12   you that there was a pour cup failure?

13        A    Isn't that amazing?  Yes, yes, I did.

14             MR. SEIGER:  Let's take a break.

15             (RECESS TAKEN FROM 12:30 p.m. to 12:51 p.m.)

16   BY MR. SEIGER:

17        Q    Did you have any discussion with Attorney

18   Virgulto during the break?

19        A    Yes.

20        Q    What did you talk about?

21        A    Sports.

22        Q    Nothing about this case?

23             THE DEPONENT:  Attorney Virgulto?

24             MR. VIRGULTO:  We didn't talk anything

1        Q      And your specific assignment in this matter was

2    to determine whether the cup design was appropriate?

3        A      That's correct.

4        Q      So you weren't asked to look at the proximate

5    cause of the plaintiffs' injury, whether a fractured cup or

6    broken cup could have, in fact, caused the plaintiffs'

7    injury?

8        A      I'm not interested in their injuries.  That's for

9    medical types to worry about.

10       Q      What I'm getting at, and let me make it very

11   clear to you, you weren't concerned as to whether -- if the

12   bottom of the cup were to break off, whether or not that

13   could be the proximate cause of what happened to the

14   plaintiffs?  You were just looking at whether or not the

15   design the cup was appropriate and nothing beyond that?

16       A      I was looking at whether the design of the cup

17   was adequate and whether or not the failure of the cup could

18   cause a steam explosion.  I was trying to answer everything

19   in this statement at work here.

20       Q      And what you've done in your report is you listed

21   a number of things that could cause a steam explosion?

22       A      Correct.

23       Q      And as you've already testified, you don't know

24   what the actual cause of the steam explosion was in this

BEECHER & HORVATH

1    matter, correct?

2         A    No, I don't know which particular sequence of

3    events led to the leakage of metal and the steam explosion.

4         Q    And as we've already established, based on the

5    work you've done to date, you don't even know that if the

6    cup failed as the plaintiffs claim it did, whether or not

7    that was, in fact, the cause of their injuries?

8         A    I can't state that with 100 percent certainty,

9    no.

10        Q    When you say you can't state that with 100

11   percent certainty, can you state it with any degree of

12   certainty?

13        A    I can state it with the degree of certainty that

14   I've already stated in my report.

15        Q    Which is a hypothesis that that is one of the

16   things that may have been the cause?

17        A    Yes.

18        Q    So really nothing more than an opinion that there

19   could have been many things that occurred here, and you just

20   don't know which one was, in fact, the proximate cause?

21        A    I was asked to determine whether or not a broken

22   cup -- first of all, if the cup was an adequate design and

23   if a broken cup could lead to this kind of situation.  I did

24   that.

BEECHER & HORVATH

1       Q       But did you do any testing to determine what the
2    results would be if the cup broke?
3       A       I haven't done any testing.  Have you?
4       Q       The answer is no, you haven't done any testing,
5    correct?
6       A       That's correct.
7       Q       So as you sit here today, you have nothing more
8    than just a hypothesis that a broken cup may have brought
9    about this injury or may have been the proximate cause of
10   the injury?
11      A       Yes, that's one possibility.
12      Q       And there are several other possibilities?
13      A       There are other possibilities.
14      Q       Did anybody ever ask you to determine which would
15   be the more likely possibility of the other possibilities
16   that you've come up with?
17      A       No, I don't think so.
18      Q       So that's never been part of your assignment?
19      A       No.  I think the statement at work there on the
20   data sheet keys it up very succinctly.
21      Q       So the answer to my question would be that was
22   not part of the assignment question?
23      A       I'm not being asked to determine -- I'm not being
24   asked to focus blame on anybody.  That's the attorney's job.


BEECHER & HORVATH

1       I'm an engineer being asked to do a technical analysis.

2              Q       Can you answer my question?

3              A       I won't put my fingers in your rice bowl.

4              Q       My question is very simple.  You were never asked

5       to determine whether or not a broken pour cup was a

6       proximate cause of the plaintiffs' injuries; is that

7       correct?

8              A       That's correct.

9              Q       I'm going to show you two additional documents

10      that I just pulled from Defendant's Exhibit 3 and ask you if

11      you could tell me what those two pages are.

12             A       These look like they are a couple of pages out of

13      the package of data I received at the beginning of

14      investigating this incident.

15             Q       Who would you have received those materials from?

16             A       I suspect from Ralph Ridgeway.

17             Q       Do you know where he would have gotten them from?

18             A       Probably from Attorney Virgulto.

19             Q       Are those the type of documents that you would

20      typically rely on in preparing a report?

21             A       Are these the kinds of documents --

22             Q       That you would rely on as an expert.

23             A       I'm sorry, I didn't hear the question.  Yeah,

24      these are the sorts of things I would use in reviewing a

```
1        A     No.
2                    MR. SEIGER:  This might be a good time to
3              break for lunch so I can go through your file and
4              then resume after lunch.
5                    (RECESS TAKEN FROM 1:41 p.m. to 2:17 p.m.)
6    BY MR. SEIGER:
7        Q     Mr. Erikson, have you published any articles with
8    respect to the properties of fused silica?
9        A     No.
10       Q     Have you ever done any original research that's
11   been reported anywhere with respect to the properties of
12   fused silica?
13       A     No.
14       Q     Have you ever provided any lectures at any
15   seminars, programs, colleges, universities, or anywhere with
16   regards to fused silica?
17       A     No.
18       Q     Have you ever taught any courses at any time with
19   respect to the properties of fused silica?
20       A     No.
21       Q     Are you an expert with respect to the properties
22   of fused silica?
23       A     No.
24       Q     How many occasions prior to today have you spoken
```

1    BY MR. SEIGER:

2        Q    Mr. Erikson, for purposes of this question, just

3    assume that the pour cup broke the way the plaintiffs'

4    counsel told you it did.

5        A    All right.

6        Q    Do you have an opinion that Mr. Graham's injuries

7    were a direct and proximate result of that breakage?

8        A    I have no opinion on injuries.  That's outside

9    the scope of my investigation.

10       Q    And what you're saying is, you wouldn't have an

11   opinion that the breaking of the pour cup led to the

12   injuries that were sustained by Mr. Cuevas?

13       A    No.

14       Q    And the same would be true with respect to the

15   injuries sustained by Mr. Graham?

16       A    Yes.

17                   MR. SEIGER:  Just give me a minute.

18                   (DISCUSSION HELD OFF THE RECORD.)

19   BY MR. SEIGER:

20       Q    Mr. Erikson, do you have an opinion as to whether

21   or not the incident giving rise to the lawsuit that we're

22   here on was a direct and proximate result of the pour cup

23   breaking?

24                   THE DEPONENT:  Could you repeat the

1          question?

2                    (THE COURT REPORTER READ THE RECORD.)

3     A     No, I do not.

4                    MR. SEIGER:  No further questions at this

5          time.

6                    MR. VIRGULTO:  I'll be brief.

7     CROSS-EXAMINATION

8     BY MR. VIRGULTO:

9          Q     Mr. Erikson, when you were retained to perform

10    the services that we're here discussing today, what was the

11    mandate given to you?

12         A     To examine the exemplar pouring cups provided and

13    determine if they could break in service.

14         Q     Okay.  And I believe it was Defendant's Exhibit

15    3, the folder which had the intake sheet from Ralph

16    Ridgeway; is that a fair characterization of the document?

17         A     Yes.

18         Q     Did that -- is this the document?

19         A     Yes.

20         Q     Okay.  And did this document fairly demonstrate

21    what that mandate was?

22         A     Yes.

23         Q     Were you asked to investigate the truth or the

24    voracity of the plaintiffs' respective claims?

BEECHER & HORVATH