UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT



\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

| | |
|---|---|
| ALEXANDER GRAHAM and | \* |
| JOSE CUEVAS, | \* |
| Plaintiffs | \* Civil No.: |
| vs | \* 3:03 CV 990 (AWT) |
| FIRELINE, INC., | \* |
| Defendant | \* |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

DEPOSITION OF RAYMOND J. ERIKSON

Taken pursuant to Federal Rules of Civil Procedure 30 and 34, held at the law offices of EDWARDS & ANGELL, 90 State House Square, Hartford, Connecticut, before Cynthia Trotta, a Registered Professional Reporter and a Notary Public in and for the State of Connecticut, on THURSDAY, MAY 27, 2004, at 10:10 a.m.

BEECHER & HORVATH

A P P E A R A N C E S :

    ATTORNEY FOR THE PLAINTIFFS:

        MONGILLO, INSLER & VIRGULTO, P.C.
           26 Elm Street
           P.O. Box 415
           New Haven, Connecticut   06502
           BY:  THOMAS A. VIRGULTO, ESQ.


    ATTORNEYS FOR THE DEFENDANT:

        EDWARDS & ANGELL, LLP
           90 State House Square
           Hartford, Connecticut   06103
           BY:  MARK B. SEIGER, ESQ.
               CHARLES F. GFELLER, ESQ.


    ALSO PRESENT:

        TERRENCE D. NEUMEYER, Westfield Group

S T I P U L A T I O N S

IT IS STIPULATED by the attorney for the Plaintiff and the attorney for the Defendant that each party reserves the right to make specific objections in open court to each and every question asked and the answers thereto given by the witness, reserving the right to move to strike out where applicable, except such objections as to the form of the question, which would be stated during the course of the deposition.

IT IS STIPULATED AND AGREED among counsel for the parties that the proof of the authority of the Notary Public before whom this deposition is taken is waived.

IT IS STIPULATED AND AGREED among counsel for the parties that the reading and the signing of the deposition is not waived.

IT IS STIPULATED AND AGREED TO among counsel for the parties that any defect as to the notice for the deposition is waived.

4

```
1      R A Y   E R I K S O N ,
2          having been first duly sworn by Cynthia Trotta, a Notary
3          Public in and for the State of Connecticut, testified
4          upon his oath as follows:
5
6      DIRECT EXAMINATION
7      BY MR. SEIGER:
8          Q    Mr. Erikson, as I introduced myself to you a
9      little while ago, I'm Mark Seiger, along with Charles
10     Gfeller; we represent Fireline in a case filed by Alexander
11     Graham and Jose Cuevas.
12             If there's any question I ask you today that you
13     don't understand, please let me know immediately so we can
14     rephrase that question because the purpose of today is to
15     get a clear record that's accurate and complete. Okay?
16         A    I understand.
17         Q    All right. I'm going to also ask that you try to
18     answer all questions verbally because "Uh-huhs," nods of the
19     head, shrugs of the shoulders, things like that, don't show
20     up on the transcript. So we really need a verbal response,
21     and "Uh-huhs" are difficult to figure out what the witness
22     meant. So if you could say "Yes" or "No" instead of
23     "Uh-huh" or "Uh-uh," that would be much better for us.
24         A    I understand.
```

1   cup failed that's involved in this case; isn't that correct?
2       A    I believe that was the whole gist of this
3   argument here.
4       Q    Well, let's start with some basics. Do you have
5   the actual pour cup that was involved in this incident?
6       A    No, I do not.
7       Q    And did you interview either of the plaintiffs in
8   this case?
9       A    No.
10      Q    Did you think it was important to talk to either
11  of them?
12      A    It would have been nice.
13      Q    Did you ever tell plaintiffs' counsel that you'd
14  like to talk to them?
15      A    They did give very complete statements. That
16  wasn't a real high priority compared to getting more
17  materials information.
18      Q    Well, let's make it simple for you. Did either
19  of the two plaintiffs in this case, either Mr. Graham or Mr.
20  Cuevas, say that they saw the bottom of the pour cup fall
21  out?
22      A    I couldn't say with certainty that there's
23  something in their testimony to that effect, but that was
24  the impression I had.

1    Q    Would you be surprised or would it impact your
2    opinion in any way if both of them didn't observe any
3    failure in the pour cup at the time the pour was taking
4    place?
5    A    Well, that would tend to render all of this
6    somewhat meaningless now, wouldn't it?
7    Q    So you would be surprised to learn that, and it
8    would impact your opinion in this case?
9    A    Yes.
10    Q    So if this pour cup -- if the bottom fell out,
11    that would have been readily observable by the operator?
12    A    I don't know that that's true.
13    Q    Well, let's take a look at something else that
14    you talk about in your report, and that is you talk about --
15    let me get the specific term here. You made a determination
16    that the bottom of the pour cup was much less dense than the
17    metal that was being poured.
18    A    Yes.
19    Q    And you've got the density of the pour cup at
20    1.95 grams per cc.s?
21    A    Correct.
22    Q    And you've got the density of the metal at 8.75
23    grams per cc.s?
24    A    Yes.

1    between the inside wall of the pour cup and the outside wall
2    of the pour cup, you recognize that there are a number of
3    factors that can influence how fast that heat exchange
4    takes?
5        A    Yes.
6        Q    And as you sit here today, you don't know what
7    effect those other factors would have as regards to that
8    heat transfer between the inside wall of the pour cup and
9    the outside wall of the pour cup?
10       A    Well, I know what effect each factor would have.
11   I just don't know what the magnitude of those effects are.
12       Q    And what would you have to do to determine the
13   magnitude of those effects?
14       A    I would have to have -- well, okay.  The simplest
15   way to determine what the temperature gradient is between
16   the inside and outside is simply place a thermal cup on
17   outside of pouring cup while metal is being poured through
18   it.  Just measure it.  Short of that, I would have to gather
19   more materials property data and build a more sophisticated
20   math model.
21       Q    Let's go back to your report, and you can open
22   page 3 of that report, which is your analysis.  And on page
23   3, the analysis starts off with this statement, "There are a
24   number of ways a direct, hyphen, chill, paren., DC, close

1    paren., billet casting operation can go awry."
2             And I take it that what you were trying to do was
3    lay out alternative causes for what happened to the
4    plaintiffs in this case?
5        A    Yeah. These are some of the ways that saw that
6    you could have the results that were observed develop.
7        Q    All right. And when you say "the results that
8    were observed," you're talking about the molten metal
9    spraying out and getting on these individuals?
10       A    I wasn't so concerned about the personnel side of
11   the equation as to just how the metal would get out of the
12   pouring operation in the first place.
13       Q    Okay. And did you list these in any type of
14   order that would indicate a significance to the way you
15   listed them?
16       A    You mean a higher probability of occurrence?
17       Q    Correct.
18       A    No.
19       Q    And are there additional ways this could have
20   occurred other than the seven ways you've listed here on
21   page 3?
22       A    I've endeavored to be comprehensive, but I'm sure
23   there's some other way that a system can fail that I haven't
24   listed.

1    Q    So as you sit here, you don't actually have
2 physical evidence to show you that there was a failure of
3 the pour cup, do you?
4    A    Obviously not.
5    Q    Okay. And if Mr. Cuevas didn't observe the pour
6 cup fail as he was using it, then you still don't have any
7 evidence of a failure; isn't that correct?
8    A    My --
9    Q    Can you just answer my question? I don't want
10 you to think beyond my question right now.
11    A    I'm sorry, it's hard to stop thinking.
12    Q    Let me just pose this question. First of all,
13 you don't have physical evidence of a failure because you
14 don't have the pour cup that was used on the date of the
15 incident, correct?
16    A    You're talking like a lawyer, Mr. Seiger.
17    Q    I am a lawyer. Can you please just answer my
18 question?
19    A    I was given the impression that we had a pour cup
20 failure. I started my analysis from that point. I am not
21 going to go back and debate whether or not there was a pour
22 cup failure because that's irrelevant to anything I've done
23 here.
24    Q    Let's start with, where did you get the

1    information that there was a pour cup failure?
2        A    I presume I received that information either from
3    my office manager, Ralph Ridgeway, at Robson Lapina and/or
4    from Mr. Virgulto.
5        Q    Okay. Do you know where they got that opinion or
6    that information?
7        A    No, I did not hire a private investigator to go
8    trace that down.
9        Q    Okay.
10       A    That's well beyond my scope of work.
11       Q    So it's clear you relied on somebody else to tell
12   you that there was a pour cup failure?
13       A    Isn't that amazing? Yes, yes, I did.
14            MR. SEIGER: Let's take a break.
15            (RECESS TAKEN FROM 12:30 p.m. to 12:51 p.m.)
16   BY MR. SEIGER:
17       Q    Did you have any discussion with Attorney
18   Virgulto during the break?
19       A    Yes.
20       Q    What did you talk about?
21       A    Sports.
22       Q    Nothing about this case?
23            THE DEPONENT: Attorney Virgulto?
24            MR. VIRGULTO: We didn't talk anything

1     A     Yes, I think we'd want to see how the metal
2  leaked out of the billet under those circumstances, if it
3  led to splattering molten metal and the cooling water and so
4  forth and what sort of spray pattern you got and how likely
5  it would be that --
6             (INTERRUPTION IN THE PROCEEDINGS.)
7     A     -- how likely it would be that that sort of spray
8  pattern would lead to injuries, I suppose.
9     Q     Have you recommended that that type of testing be
10 done in this case?
11    A     No, not that far along in investigating this.
12    Q     Would it be fair to say that you would consider
13 yourself to be at the initial phases of this investigation
14 or the early stages?
15    A     That would be fair to say.
16    Q     As you sit here today, do you have any plans to
17 conduct additional testing or investigation in this matter?
18    A     I've outlined some things that could be done.
19    Q     Is that the outline that you've provided by way
20 of Exhibit 4, the letter dated November 3 of 2003?
21    A     Yes.
22    Q     And to date you haven't been granted authority to
23 do any of that testing, have you?
24    A     That's correct.

1    Q    And did Ralph Ridgeway provide you information
2    regarding this matter?
3    A    I'm looking at this summary and note section
4    right here, and it says, "Alexander Graham and Jose Cuevas
5    were working on casting machine. They poured the molten
6    metal into cup, the cup cracked and spilled onto other parts
7    of machine causing a steam explosion. Graham and Cuevas
8    suffered steam burns. Robson Lapina to determine if cup
9    design is adequate."
10   Q    Do you know where that information you just read
11   came from?
12   A    No, I do not.
13   Q    Did you take that original phone call?
14   A    No, I did not.
15   Q    Did Mr. Ridgewell take that --
16   A    Ridgeway.
17   Q    -- Ridgeway take that original phone call from
18   plaintiffs' counsel?
19   A    That would be my guess. I don't know that for a
20   certainty.
21   Q    At the time that you received that assignment
22   from Robson Lapina, what did you do?
23   A    I probably called up Attorney Virgulto to discuss
24   the case with him. That's standard procedure.

```
 1      Q    And your specific assignment in this matter was
 2   to determine whether the cup design was appropriate?
 3      A    That's correct.
 4      Q    So you weren't asked to look at the proximate
 5   cause of the plaintiffs' injury, whether a fractured cup or
 6   broken cup could have, in fact, caused the plaintiffs'
 7   injury?
 8      A    I'm not interested in their injuries.  That's for
 9   medical types to worry about.
10      Q    What I'm getting at, and let me make it very
11   clear to you, you weren't concerned as to whether -- if the
12   bottom of the cup were to break off, whether or not that
13   could be the proximate cause of what happened to the
14   plaintiffs?  You were just looking at whether or not the
15   design the cup was appropriate and nothing beyond that?
16      A    I was looking at whether the design of the cup
17   was adequate and whether or not the failure of the cup could
18   cause a steam explosion.  I was trying to answer everything
19   in this statement at work here.
20      Q    And what you've done in your report is you listed
21   a number of things that could cause a steam explosion?
22      A    Correct.
23      Q    And as you've already testified, you don't know
24   what the actual cause of the steam explosion was in this
```

1   matter, correct?

2   A    No, I don't know which particular sequence of
3   events led to the leakage of metal and the steam explosion.

4   Q    And as we've already established, based on the
5   work you've done to date, you don't even know that if the
6   cup failed as the plaintiffs claim it did, whether or not
7   that was, in fact, the cause of their injuries?

8   A    I can't state that with 100 percent certainty,
9   no.

10  Q    When you say you can't state that with 100
11  percent certainty, can you state it with any degree of
12  certainty?

13  A    I can state it with the degree of certainty that
14  I've already stated in my report.

15  Q    Which is a hypothesis that that is one of the
16  things that may have been the cause?

17  A    Yes.

18  Q    So really nothing more than an opinion that there
19  could have been many things that occurred here, and you just
20  don't know which one was, in fact, the proximate cause?

21  A    I was asked to determine whether or not a broken
22  cup -- first of all, if the cup was an adequate design and
23  if a broken cup could lead to this kind of situation.  I did
24  that.

1        Q     But did you do any testing to determine what the
2 results would be if the cup broke?
3        A     I haven't done any testing. Have you?
4        Q     The answer is no, you haven't done any testing,
5 correct?
6        A     That's correct.
7        Q     So as you sit here today, you have nothing more
8 than just a hypothesis that a broken cup may have brought
9 about this injury or may have been the proximate cause of
10 the injury?
11       A     Yes, that's one possibility.
12       Q     And there are several other possibilities?
13       A     There are other possibilities.
14       Q     Did anybody ever ask you to determine which would
15 be the more likely possibility of the other possibilities
16 that you've come up with?
17       A     No, I don't think so.
18       Q     So that's never been part of your assignment?
19       A     No. I think the statement at work there on the
20 data sheet keys it up very succinctly.
21       Q     So the answer to my question would be that was
22 not part of the assignment question?
23       A     I'm not being asked to determine -- I'm not being
24 asked to focus blame on anybody. That's the attorney's job.

BEECHER & HORVATH

1    I'm an engineer being asked to do a technical analysis.

2    Q    Can you answer my question?

3    A    I won't put my fingers in your rice bowl.

4    Q    My question is very simple.  You were never asked
5    to determine whether or not a broken pour cup was a
6    proximate cause of the plaintiffs' injuries; is that
7    correct?

8    A    That's correct.

9    Q    I'm going to show you two additional documents
10   that I just pulled from Defendant's Exhibit 3 and ask you if
11   you could tell me what those two pages are.

12   A    These look like they are a couple of pages out of
13   the package of data I received at the beginning of
14   investigating this incident.

15   Q    Who would you have received those materials from?

16   A    I suspect from Ralph Ridgeway.

17   Q    Do you know where he would have gotten them from?

18   A    Probably from Attorney Virgulto.

19   Q    Are those the type of documents that you would
20   typically rely on in preparing a report?

21   A    Are these the kinds of documents --

22   Q    That you would rely on as an expert.

23   A    I'm sorry, I didn't hear the question.  Yeah,
24   these are the sorts of things I would use in reviewing a

```
 1    BY MR. SEIGER:
 2        Q    Mr. Erikson, for purposes of this question, just
 3    assume that the pour cup broke the way the plaintiffs'
 4    counsel told you it did.
 5        A    All right.
 6        Q    Do you have an opinion that Mr. Graham's injuries
 7    were a direct and proximate result of that breakage?
 8        A    I have no opinion on injuries.  That's outside
 9    the scope of my investigation.
10        Q    And what you're saying is, you wouldn't have an
11    opinion that the breaking of the pour cup led to the
12    injuries that were sustained by Mr. Cuevas?
13        A    No.
14        Q    And the same would be true with respect to the
15    injuries sustained by Mr. Graham?
16        A    Yes.
17             MR. SEIGER:  Just give me a minute.
18             (DISCUSSION HELD OFF THE RECORD.)
19    BY MR. SEIGER:
20        Q    Mr. Erikson, do you have an opinion as to whether
21    or not the incident giving rise to the lawsuit that we're
22    here on was a direct and proximate result of the pour cup
23    breaking?
24             THE DEPONENT:  Could you repeat the
```

```
 1              question?
 2                   (THE COURT REPORTER READ THE RECORD.)
 3      A    No, I do not.
 4              MR. SEIGER:  No further questions at this
 5         time.
 6              MR. VIRGULTO:  I'll be brief.
 7   CROSS-EXAMINATION
 8   BY MR. VIRGULTO:
 9      Q    Mr. Erikson, when you were retained to perform
10   the services that we're here discussing today, what was the
11   mandate given to you?
12      A    To examine the exemplar pouring cups provided and
13   determine if they could break in service.
14      Q    Okay.  And I believe it was Defendant's Exhibit
15   3, the folder which had the intake sheet from Ralph
16   Ridgeway; is that a fair characterization of the document?
17      A    Yes.
18      Q    Did that -- is this the document?
19      A    Yes.
20      Q    Okay.  And did this document fairly demonstrate
21   what that mandate was?
22      A    Yes.
23      Q    Were you asked to investigate the truth or the
24   voracity of the plaintiffs' respective claims?
```