UNITED STATES DISCTRICT COURT  FILED
DISCTRICT OF CONNECTICUT

| ALEXANDER GRAHAM and | : | CIVIL NO. 3:03-CV-990 (AWT) |
| JOSE CUEVAS, | : | |
| Plaintiffs | : | U.S. DISTRICT COURT |
| | : | HARTFORD, CT. |
| Vs. | : | |
| | : | |
| FIRELINE, INC., | : | |
| Defendant | : | JUNE 22, 2004 |

**PLAINTIFF'S MEMORANDUM OF LAW IN OBJECTION TO DEFENDANT'S MOTION TO PRECLUDE PROFFERED EXPERT TESTIMONY OF RAYMOND J. ERIKSON**

I.  **PRELIMINARY STATEMENT:**

The Plaintiffs herein, ALEXANDER GRAHAM and JOSE CUEVAS, hereby object to the granting of the Defendant's Motion to Preclude Proffered Expert Testimony of Raymond J. Erikson, dated June 15, 2004. Plaintiffs contend that this expert's testimony is relevant, reliable and necessary to the issues at bar. Plaintiffs further object to the Defendant's claims, as set forth at the top of page 2 of said Defendant's Memorandum, that the Plaintiffs' expert, Raymond J. Erikson, not be afforded any "further opportunity to conduct testing or any further analysis in this matter" (Defendant's Memorandum, p. 2), as there exists no legal basis to so prevent same.

II.  **BACKGROUND:**

The case at hand involves an incident at the Ansonia Copper & Brass foundry in Ansonia, Connecticut, which occurred on June 3, 2000. On said date, the Plaintiff, JOSE CUEVAS, was engaged in the casting process at Station No. 21, conducting a "pour." This is the process, by which molten metal is poured, by the caster, from the furnace into certain molds, for the purpose of forming billets. The molten metal is poured into a

"running box," which channels the metal towards two (2) fused silica "pouring cups" as manufactured by the Defendant. These "pouring cups" each contain four (4) holes, which direct the flow of the poured metal towards the exterior of the mold. As the molds are formed, they are lowered into water-filled cooling tanks, which serve to cool and solidify the billets.

It is the contention of the Plaintiffs herein that one of the "pouring cups" manufactured by the Defendant, failed, thereby allowing molten metal to mass, undirected, in the center of the forming billet. It is the argument of these Plaintiffs that the base of the "pouring cup" broke, thereby preventing the distribution of molten metal to the sides of the mold. This improper distribution of molten metal caused one such billet to rupture, or leak, allowing molten metal to leave the billet and enter the cooling tank. When the molten metal came in contact with the cold water, a flash explosion of steam occurred. In the process, the Plaintiffs (caster, JOSE CUEVAS, and supervisor, ALEXANDER GRAHAM) suffered considerable burns across much of their respective bodies.

Subsequent to the incidents of June 3, 2000, an investigation into the occurrence was conducted by the U.S. Department of Labor, Occupational Safety and Health Administration (hereinafter referred to as "OSHA"). An inspection of the facility was conducted by OSHA on June 5, 2000. This inspection is memorialized in a twelve (12) page report which is annexed hereto as <u>Exhibit A</u>. It should be noted that OSHA reported, in section (g) of such report, entitled "walkaround", and located on then 5th page of said report:

> Only the top portion of the cups were present in the running box. The top portion of the cup in the north underside of the running box matched a bottom cup portion found by the employer on 6/3/00. There were no cracks around the holes of the 1 cup found. The bottom cup portion for the south side of the running box was not found. ***This was of note since the cups directed the metal towards the mold wall to form the billet wall. If the cup did not direct the metal to the mold wall but rather allowed the metal to collect in the middle, the sump of billet may have been too long.*** [Emphasis added]

Plaintiffs commenced this cause of action, a violation of the Connecticut Products Liability Act, C.G.S. Section 52-572m, et seq., against the Defendant, FIRELINE, INC., alleging that the cup manufactured and sold by the Defendant was defective and/or unreasonably dangerous, and that this factor led to the steam explosion on June 3, 2000. Pursuant to C.G.S. Section 52-572m, a products liability claim is defined as including all claims for damages caused by the "manufacture, construction, design, formula, preparation, assembly, installation, testing, warnings, instructions, marketing, packaging or labeling of any product."

III.   **ARGUMENT:**

Pursuant to Fed.R.Civ.P. 26(a)(2)(A), a Party "shall disclose to other Parties the identity of any person who may be used to present evidence under rules 702, 703 or 705 of the Federal Rules of Evidence." Fed.R.Evid. 702 states that, if technical or specialized knowledge will aid the trier of fact, a witness qualified as an expert "may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." On

January 29, 2004, the Plaintiffs disclosed Raymond J. Erikson as their expert with regards to liability. Attached to such Disclosure, was Mr. Erikson's Engineer's report.

Mr. Erikson's mandate, and the subject matter of his inquiry and investigation, was the "cause of the failure of the ceramic pouring cup, which resulted in a billet leak which thereafter caused an explosion of steam and molten metal which ultimately injured the Plaintiff's." See Exhibit B, Disclosure of Expert, dated January 29, 2004, attached hereto. Mr. Erikson's investigation concluded with the findings set forth in his report of November 3, 2003.

The Defendant, in prosecuting its Motion, relies upon language set forth in the matter of Daubert v Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 593 (1993), wherein the Court stated that the trial judge must determine whether "the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue." In addressing this passage, it is abundantly clear that the testimony to be elicited is indeed scientific. Therefore, a scientific analysis of the facts and circumstances associated with the steam explosion of June 3, 2000 is necessary to aid the trier of fact in determining the key elements that make up a product liability claim. See Saia v Sears Roebuck & Co., Inc., 47 F.Supp.2d 141, 144 (D. Mass. 1999). The analysis of an expert is of tantamount importance, as the opinions garnered from such party are necessary to assist the trier of fact in addressing the particular factual issues at bar.

It is the Plaintiff's contention that, as a result of the failure of the ceramic pouring cup, molten metal was not properly distributed into the mold. As a direct result of this

insufficient distribution, molten metal settled into the mold in an inappropriate fashion. Thereafter, the billet began to leak molten metal into the cold water of the cooling tank. When this metal made contact with the cold water, a flash steam explosion resulted, the effect of which was the burns sustained by Messrs. GRAHAM and CUEVAS.

To that end, the Plaintiff's retained the services of Raymond J. Erikson, M.Sc.. His Curriculum Vitae is annexed hereto as Exhibit C. Mr. Erikson was not charged with an examination into the properties of fused silica, as the Defendant has argued. Rather, Mr. Erikson's mandate was simple and clear, as demonstrated by his deposition testimony, annexed hereto as Exhibit D:

> Q: Mr. Erikson, when you were retained to perform the services that we're here discussing today, what was the mandate given to you?
>
> A: To examine the exemplar pouring cups provided and determine if they could break in service.

See Dep. Tr. Of Erikson, at pp.129.

Raymond J. Erikson's sole function was to examine and evaluate the Defendant's pouring cup, to determine whether they could break in service. His task was to utilize the skills demonstrated in his Curriculum Vitae, including his training and education as a material systems engineer, to determine if the subject pouring cup was suitable for its part in the downcasting operation at Ansonia Copper & Brass.

In its Motion to Preclude, the Defendant states "Erikson does not qualify as an "expert" in the design, manufacture, or application of the fused silica pour cup at issue. The Defendant places some reliance upon Free v Bondo-Mar-Hyde Corp., 25 Fed. Appx. 170 (4th Cir. 2002). In that case, the Court indicated that "[t]he expert's opinion

was based upon his *assumptions* of what caused the can to explode rather than on scientific, technical, or other specialized knowledge. ... Because the expert's testimony is based merely on his *belief and speculation* and is therefore not reliable the district court did not abuse its discretion in excluding his testimony." [Emphasis added] However, Erikson's conclusions are not based upon mere speculation. Rather, they are premised upon his examination, evaluation and testing, to wit:

> Q:   Okay. Specifically, what were the specific tests or analysis that you did perform?
>
> A:   Well, I measured the pouring material density to get some feel for what it might be. I examined it underneath a electron microscope to determine the structure of the material. I subjected it to a energy disbursement spectrometry to determine the elemental composition of the material; that, in turn, allowed me to come up with reasonable estimates of what the material was, and then based on that information, obtain handbook properties for comparison to the tensile stresses that I calculated would develop under any given temperature differential.

See Dep. Tr. Of Erikson, at pp.130-131.

> Q:   Now, there was some discussion about design defects, and I believe you testified that there was in your opinion a design defect in as far as the application of this particular product to the use that we're discussing us that correct?
>
> A:   Correct. There's nothing fundamentally wrong with the design if its used in a different way. But if it's loaded under tension ay high temperature as this part is in this application, then yes, its probably not designed appropriately for its intended application.

See Dep. Tr. Of Erikson, at pp.137-138.

> Q:   Now, you indicated, also referenced in your report, some of the, for lack of a better word, the math that goes into your analysis with regards to the equations. Did the method that you used in terms of making the calculations that you made, what is the source of that method or knowledge of that methodology?

> A:        I obtained that directly from Rourke.
>
> Q:        And is Rourke an accepted literature in the industry?
>
> A:        It's the Bible of stress analysis.

See Dep. Tr. Of Erikson, at pp.138-139.

The Defendant further contends that Mr. Erikson is not qualified to offer expert testimony regarding whether the pour cup in this case is defective. Defendant bases this conclusion, in part, upon the responses of Mr. Erikson found on pages 23-25 of his deposition transcript. The Defendant reaches this conclusion in reliance upon the fact that Mr. Erikson, admittedly, is not an expert with regards to the design and manufacture of fused silica parts, the development and design of pouring cups or foundry and downcast operations. While the preceding list seem replete with seemingly important terms, it do not accurately reflect the subject matter at issue. It is true that we are evaluating an incident involving a fused silica part utilized in a foundry engaging in downcast operations. However, it is neither Plaintiff's intention nor desire to utilize this expert to demonstrate and explain the functions and methods of foundry downcast operations. Furthermore, it is not this expert's role to wax poetic upon the manufacturing process or design of fused silica and its byproducts. This task presented to Mr. Erikson, was far more specific than the broad categories reflected in the referenced interrogatories. Mr. Erikson was given the responsibility of **examining the exemplar pouring cups provided, in order to determine whether they could break during service**. This issue, and this alone, is what motivated Mr. Erikson's inquiry.

If the Plaintiff can prove that the pouring cup failed, due to a design defect, or an inappropriate use of same, and that this factor led to the leak of the south billet, the

Plaintiff's will have taken large steps towards establishing liability. There is little evidence to dispute that on June 3, 2000, the south billet at casting station No. 21 leaked molten metal into the cooling tank. To quote the Defendant from Page 3 of its own Memorandum, "All casters know, when molten metal and water com into contact, a flash explosion occurs." Such an explosion did in fact occur. Whether or not a broken pour cup was a proximate cause of the Plaintiffs' injuries is not the province of this expert, as the Defendant would suggest. The cause of physical injuries lie within the expertise of the medical experts so disclosed.

The Plaintiffs' expert examined the thermal properties of an exemplar pouring cup, in order to determine whether such an item could withstand the thermal stresses of the downcasting operation. He indicated that further testing would be necessary to reinforce these conclusions.

On Page 5 of the Engineer's Report (annexed hereto as <u>Exhibit E</u>), he states: "While the thermal stresses developed in the pouring cup almost certainly exceed the nominal strength of the cup material under the conditions present during casting, the magnitude of the stresses actually developed cannot be determined without more detailed thermal analysis of both the billet-mold system and the cup installation. This analysis would require work beyond the current scope of effort."

This position is reinforced in Mr. Erikson's letter dated November 3, 2003, attached hereto as <u>Exhibit F</u>, wherein he states: "Enclosed is a report that describes the properties of the exemplar pouring cup that you supplied to me, along with an estimate of the thermal stresses that might develop during casing operations. Additional tasks that

would serve to reinforce any case, which you might like to bring against the manufacturer, would include mechanical testing of exemplar pouring cup specimens to determine actual strengths, and thermal analysis of the mold system and pouring cup installation to determine actual temperature distributions and thermal stresses."

The Plaintiffs' expert conducted his experimentation, according to sound math and science, and reached a conclusion that the subject pouring cup was not suitable for the intended purposes.

Mr. Erikson goes on to state on Pages 3-4 of his Engineer's Report (Exhibit E) that: "the distribution of molten metal in the mold would change significantly, since four separate streams of metal previously directed to the sides would become a single large stream directed to the middle of the mold. With less of the molten metal exposed to the cooling sidewalls of the mold, more of the metal in the mold could remain above the freezing point. This could conceivably lead to excessive heat buildup in the billet, and result in the observed billet leakage." In his deposition (Dep. Tr. Of Erikson, at pp.143), the expert replies that "[t]he purpose of additional testing and analysis would be to reduce the uncertainty associated with the pouring cup thermal properties and the pouring cup environment." It is anticipated that the further testing suggested by Mr. Erikson will confirm the conclusions made in his Engineer's Report.

There is no provision in either the Rules of Civil Procedure, or the Rules of Evidence that empowers the Court to limit the efforts taken by an expert, as suggested by the Defendant herein. To hold as such would stifle and prejudice the efforts of all experts. Is a Plaintiff seeking damages for personal injuries precluded from seeking any

further treatment with a physician he or she has disclosed as an expert, following such disclosure? No. Such a conclusion would be foolhardy. Such a conclusion is not supported by statute or case law in this situation as well. Disclosed materials are always subject to change. Thus, there is a burden of supplementation that lies upon the shoulders of all Parties. In fact, Fed.R.Civ.P 26(a)(2)(C) almost anticipates such a scenario, wherein it states "[t]he parties shall supplement these disclosures when required under subsection (e)(1)." That provision, Fed.R.Civ.P. 26(e)(1), mandates that a party shall supplement any disclosures "if a party learns that in some material respect the information disclosed is incomplete or incorrect and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process in writing." This ongoing obligation follows all discovery. Therefore, Defendant's notion defies the spirit of the Rules.

IV.   **CONCLUSION:**

The Defendant first states that this expert is not qualified to proffer expert testimony regarding fused silica, as he does not qualify as an "expert" with regards to the design, manufacture or application of fused silica. This confuses the issue, and is misleading. This expert was not retained to extol the virtues or vices of fused silica. Rather, he was retained to examine one item comprising of fused silica, in order to determine its functionality in a downcast operation involving molten metal. His examination and evaluation was premises upon sound, accepted science, and the conclusions reached supported thereby.

The Defendant further argues that this expert has not subjected his hypothesis to peer review, and does not know whether these conclusions are generally accepted in the relevant scientific or technical community as provided under Daubert. Nevertheless, the Defendant, aside from reciting the rhetoric of Daubert, offers little more in support thereof, than Mr. Erikson's denials that he has published, lectured or taught about fused silica.

The opinions of Raymond J. Erikson to date, as well as those conclusions reached in further testing are indeed reliable and relevant to the case at issue. They will serve to assist the trier of fact in understanding the evidence offered by the Plaintiffs. As such, the Defendant's Motion to Preclude must be denied.

THE PLAINTIFFS

By_____
Thomas A. Virgulto, Esq.
Fed Bar No. ct 12058
Mongillo, Insler & Virgulto, P.C.
P.O. Box 514
New Haven, CT 06502
(203) 787-5805

**ORDER:** The foregoing Objection having been presented and heard, it is hereby

SUSTAINED / DENIED.

BY THE COURT (          , J.)

_____
Asst. Clerk / Judge

**CERTIFICATION**: I hereby certify that a copy of the foregoing was mailed, postage prepaid, to Charles F. Gfeller, Esq., Edwards & Angell, LLP, 90 State House Square, Hartford, CT 06103, on June 23, 2004.

Thomas A. Virgulto