UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT



* * * * * * * * * * * * * * * * * *

ALEXANDER GRAHAM and          *
JOSE CUEVAS,                  *
        Plaintiffs     *  Civil No.:
    vs                    *  3:03 CV 990 (AWT)
FIRELINE, INC.,               *
        Defendant      *

* * * * * * * * * * * * * * * * * *


DEPOSITION OF RAYMOND J. ERIKSON

Taken pursuant to Federal Rules of Civil Procedure 30 and 34, held at the law offices of EDWARDS & ANGELL, 90 State House Square, Hartford, Connecticut, before Cynthia Trotta, a Registered Professional Reporter and a Notary Public in and for the State of Connecticut, on THURSDAY, MAY 27, 2004, at 10:10 a.m.

BEECHER & HORVATH

A P P E A R A N C E S :

    ATTORNEY FOR THE PLAINTIFFS:

        MONGILLO, INSLER & VIRGULTO, P.C.
            26 Elm Street
            P.O. Box 415
            New Haven, Connecticut  06502
        BY:  THOMAS A. VIRGULTO, ESQ.


    ATTORNEYS FOR THE DEFENDANT:

        EDWARDS & ANGELL, LLP
            90 State House Square
            Hartford, Connecticut  06103
        BY:  MARK B. SEIGER, ESQ.
             CHARLES F. GFELLER, ESQ.


    ALSO PRESENT:

        TERRENCE D. NEUMEYER, Westfield Group

S T I P U L A T I O N S

IT IS STIPULATED by the attorney for the Plaintiff and the attorney for the Defendant that each party reserves the right to make specific objections in open court to each and every question asked and the answers thereto given by the witness, reserving the right to move to strike out where applicable, except such objections as to the form of the question, which would be stated during the course of the deposition.

IT IS STIPULATED AND AGREED among counsel for the parties that the proof of the authority of the Notary Public before whom this deposition is taken is waived.

IT IS STIPULATED AND AGREED among counsel for the parties that the reading and the signing of the deposition is not waived.

IT IS STIPULATED AND AGREED TO among counsel for the parties that any defect as to the notice for the deposition is waived.

BEECHER & HORVATH

```
 1          R A Y    E R I K S O N,
 2       having been first duly sworn by Cynthia Trotta, a Notary
 3       Public in and for the State of Connecticut, testified
 4       upon his oath as follows:
 5
 6   DIRECT EXAMINATION
 7   BY MR. SEIGER:
 8       Q    Mr. Erikson, as I introduced myself to you a
 9   little while ago, I'm Mark Seiger, along with Charles
10   Gfeller; we represent Fireline in a case filed by Alexander
11   Graham and Jose Cuevas.
12            If there's any question I ask you today that you
13   don't understand, please let me know immediately so we can
14   rephrase that question because the purpose of today is to
15   get a clear record that's accurate and complete.  Okay?
16       A    I understand.
17       Q    All right.  I'm going to also ask that you try to
18   answer all questions verbally because "Uh-huhs," nods of the
19   head, shrugs of the shoulders, things like that, don't show
20   up on the transcript.  So we really need a verbal response,
21   and "Uh-huhs" are difficult to figure out what the witness
22   meant.  So if you could say "Yes" or "No" instead of
23   "Uh-huh" or "Uh-uh," that would be much better for us.
24       A    I understand.
```

```
 1      A      I'm sure if we did go to court and I rendered my
 2   opinion, that anything in error would be corrected by
 3   Fireline's witnesses.
 4      Q      Can you answer my question now?  I know you don't
 5   want to, but can you answer it?
 6      A      What's that?
 7      Q      Would it be scientifically sound for you to go in
 8   and render an opinion in this case before the judge before
 9   you get this additional information?
10      A      That opinion is as sound as it can be based on
11   the information I have available to me to date.
12      Q      And what you're telling us, what you've already
13   testified is that to date you only have limited information?
14      A      Yes.
15      Q      And there's other information that is easily
16   obtainable that you should have before you go into court?
17      A      I don't know how easily obtainable it is.  I
18   think I requested those material and process specifications
19   way back at the beginning.  They were never provided.
20      Q      You requested those from plaintiffs' counsel?
21      A      I'm sure he submitted a request to you for that
22   information.
23      Q      Are you certain of that?
24      A      I'm sure he did.
```

1  there. So that helps balance the flexure test against a
2  less ambiguous test. Gives you better feel for what the
3  true strengths of the material are. If possible, it would
4  be desirable to do a genuine tensile test on the material,
5  but that's always hard with ceramic.
6       Q    How would you go about doing that?
7       A    Well, that's always hard to say. Tends to vary
8  from material to material as to what gives the best results
9  in tension because they are -- ceramics are so brittle. You
10 have to hold them just right to get any kind of useful
11 tensile test data. And there's all sorts of different ways
12 of doing that. I'd have to run a number of different tests
13 which would give the most consistent tensile test results.
14      Q    Any other tests?
15      A    Should also do tests of the thermal properties.
16 That would involve doing some thermal conductivity testing,
17 which is obviously a large factor here, and some thermal
18 expansion testing, neither one of which is a trivial test.
19      Q    Why are the thermal properties of this cup
20 important to you?
21      A    Well, the magnitude of the stresses that develop
22 in the pouring cup are inextricably linked to the thermal
23 behavior of the material in the pouring cup. In other
24 words, how fast the heat is conducted from the molten metal

1    A    No.

2    Q    So even based on your calculations, that pour cup
3 won't necessarily fail?

4    A    If you look at my report, you will see that I
5 have cited minimum values for strength from ASTM standard.
6 That doesn't mean that all pour cups are made to exactly
7 those minimum values. In fact, chances are they're
8 generally much stronger than that.

9    Q    Well, this pour cup that we're using here that
10 was manufactured by Fireline, do you know what the strength
11 of it is?

12    A    I do not.

13    Q    Did you do any calculations --

14    A    You can't calculate strength.

15    Q    So all you're telling us in your expert opinion
16 is that if we look at the minimum value set out by ASTM, and
17 we assume that this pour cup only has the minimum values
18 that ASTM has specified, this pour cup will fail?

19    A    That is correct.

20    Q    So you're not telling us that this pour cup
21 failed because it didn't have sufficient strength?

22    A    Obviously, if it failed, it did not have
23 sufficient strength.

24    Q    Okay. Well, you don't even know that this pour

64

1  cup failed that's involved in this case; isn't that correct?
2      A    I believe that was the whole gist of this
3  argument here.
4      Q    Well, let's start with some basics. Do you have
5  the actual pour cup that was involved in this incident?
6      A    No, I do not.
7      Q    And did you interview either of the plaintiffs in
8  this case?
9      A    No.
10     Q    Did you think it was important to talk to either
11 of them?
12     A    It would have been nice.
13     Q    Did you ever tell plaintiffs' counsel that you'd
14 like to talk to them?
15     A    They did give very complete statements. That
16 wasn't a real high priority compared to getting more
17 materials information.
18     Q    Well, let's make it simple for you. Did either
19 of the two plaintiffs in this case, either Mr. Graham or Mr.
20 Cuevas, say that they saw the bottom of the pour cup fall
21 out?
22     A    I couldn't say with certainty that there's
23 something in their testimony to that effect, but that was
24 the impression I had.

1    Q    Would you be surprised or would it impact your
2    opinion in any way if both of them didn't observe any
3    failure in the pour cup at the time the pour was taking
4    place?
5    A    Well, that would tend to render all of this
6    somewhat meaningless now, wouldn't it?
7    Q    So you would be surprised to learn that, and it
8    would impact your opinion in this case?
9    A    Yes.
10   Q    So if this pour cup -- if the bottom fell out,
11   that would have been readily observable by the operator?
12   A    I don't know that that's true.
13   Q    Well, let's take a look at something else that
14   you talk about in your report, and that is you talk about --
15   let me get the specific term here.  You made a determination
16   that the bottom of the pour cup was much less dense than the
17   metal that was being poured.
18   A    Yes.
19   Q    And you've got the density of the pour cup at
20   1.95 grams per cc.s?
21   A    Correct.
22   Q    And you've got the density of the metal at 8.75
23   grams per cc.s?
24   A    Yes.

1    between the inside wall of the pour cup and the outside wall
2    of the pour cup, you recognize that there are a number of
3    factors that can influence how fast that heat exchange
4    takes?
5        A    Yes.
6        Q    And as you sit here today, you don't know what
7    effect those other factors would have as regards to that
8    heat transfer between the inside wall of the pour cup and
9    the outside wall of the pour cup?
10       A    Well, I know what effect each factor would have.
11   I just don't know what the magnitude of those effects are.
12       Q    And what would you have to do to determine the
13   magnitude of those effects?
14       A    I would have to have -- well, okay.  The simplest
15   way to determine what the temperature gradient is between
16   the inside and outside is simply place a thermal cup on
17   outside of pouring cup while metal is being poured through
18   it.  Just measure it.  Short of that, I would have to gather
19   more materials property data and build a more sophisticated
20   math model.
21       Q    Let's go back to your report, and you can open
22   page 3 of that report, which is your analysis.  And on page
23   3, the analysis starts off with this statement, "There are a
24   number of ways a direct, hyphen, chill, paren., DC, close

82

1    paren., billet casting operation can go awry."
2           And I take it that what you were trying to do was
3    lay out alternative causes for what happened to the
4    plaintiffs in this case?
5      A    Yeah. These are some of the ways that saw that
6    you could have the results that were observed develop.
7      Q    All right. And when you say "the results that
8    were observed," you're talking about the molten metal
9    spraying out and getting on these individuals?
10     A    I wasn't so concerned about the personnel side of
11   the equation as to just how the metal would get out of the
12   pouring operation in the first place.
13     Q    Okay. And did you list these in any type of
14   order that would indicate a significance to the way you
15   listed them?
16     A    You mean a higher probability of occurrence?
17     Q    Correct.
18     A    No.
19     Q    And are there additional ways this could have
20   occurred other than the seven ways you've listed here on
21   page 3?
22     A    I've endeavored to be comprehensive, but I'm sure
23   there's some other way that a system can fail that I haven't
24   listed.

1    Q    Okay. And what you then say is, "However, the
2    distribution of the molten metal in the mold would change
3    significantly since four separate streams of metal
4    previously direct to the sides of the mold would become a
5    single large stream directed to the middle of the mold."
6         So what you're talking about, rather than coming
7    out the sides, it's now going straight down the center?
8    A    Correct.
9    Q    And without doing testing and actually trying to
10   have a bottom of the pour cup fall out and see what the
11   effect would be, you don't know whether or not that could
12   actually cause what happened to the plaintiffs in this case?
13   A    No, I don't know with absolute certainty what
14   happened there. I wasn't there.
15   Q    Well, not only don't you know with certainty, not
16   having run that type of a test to see what the effect would
17   be, if a bottom fell out towards the end of a pour, you
18   don't know what would happen at all; it would be guessing?
19   A    Yes.
20   Q    So even if the pour cup had failed as the
21   plaintiffs claim, you don't know that that could have caused
22   the injuries that they allegedly sustained?
23   A    Not with certainty.
24   Q    And as we sit here today, I guess you have -- if

1  Q   And your specific assignment in this matter was
2  to determine whether the cup design was appropriate?
3  A   That's correct.
4  Q   So you weren't asked to look at the proximate
5  cause of the plaintiffs' injury, whether a fractured cup or
6  broken cup could have, in fact, caused the plaintiffs'
7  injury?
8  A   I'm not interested in their injuries. That's for
9  medical types to worry about.
10 Q   What I'm getting at, and let me make it very
11 clear to you, you weren't concerned as to whether -- if the
12 bottom of the cup were to break off, whether or not that
13 could be the proximate cause of what happened to the
14 plaintiffs? You were just looking at whether or not the
15 design the cup was appropriate and nothing beyond that?
16 A   I was looking at whether the design of the cup
17 was adequate and whether or not the failure of the cup could
18 cause a steam explosion. I was trying to answer everything
19 in this statement at work here.
20 Q   And what you've done in your report is you listed
21 a number of things that could cause a steam explosion?
22 A   Correct.
23 Q   And as you've already testified, you don't know
24 what the actual cause of the steam explosion was in this

1    matter, correct?

2    A    No, I don't know which particular sequence of
3    events led to the leakage of metal and the steam explosion.

4    Q    And as we've already established, based on the
5    work you've done to date, you don't even know that if the
6    cup failed as the plaintiffs claim it did, whether or not
7    that was, in fact, the cause of their injuries?

8    A    I can't state that with 100 percent certainty,
9    no.

10    Q    When you say you can't state that with 100
11    percent certainty, can you state it with any degree of
12    certainty?

13    A    I can state it with the degree of certainty that
14    I've already stated in my report.

15    Q    Which is a hypothesis that that is one of the
16    things that may have been the cause?

17    A    Yes.

18    Q    So really nothing more than an opinion that there
19    could have been many things that occurred here, and you just
20    don't know which one was, in fact, the proximate cause?

21    A    I was asked to determine whether or not a broken
22    cup -- first of all, if the cup was an adequate design and
23    if a broken cup could lead to this kind of situation. I did
24    that.

```
 1        Q     But did you do any testing to determine what the
 2   results would be if the cup broke?
 3        A     I haven't done any testing.  Have you?
 4        Q     The answer is no, you haven't done any testing,
 5   correct?
 6        A     That's correct.
 7        Q     So as you sit here today, you have nothing more
 8   than just a hypothesis that a broken cup may have brought
 9   about this injury or may have been the proximate cause of
10   the injury?
11        A     Yes, that's one possibility.
12        Q     And there are several other possibilities?
13        A     There are other possibilities.
14        Q     Did anybody ever ask you to determine which would
15   be the more likely possibility of the other possibilities
16   that you've come up with?
17        A     No, I don't think so.
18        Q     So that's never been part of your assignment?
19        A     No.  I think the statement at work there on the
20   data sheet keys it up very succinctly.
21        Q     So the answer to my question would be that was
22   not part of the assignment question?
23        A     I'm not being asked to determine -- I'm not being
24   asked to focus blame on anybody.  That's the attorney's job.
```

108

1    I'm an engineer being asked to do a technical analysis.
2    Q    Can you answer my question?
3    A    I won't put my fingers in your rice bowl.
4    Q    My question is very simple.  You were never asked
5    to determine whether or not a broken pour cup was a
6    proximate cause of the plaintiffs' injuries; is that
7    correct?
8    A    That's correct.
9    Q    I'm going to show you two additional documents
10   that I just pulled from Defendant's Exhibit 3 and ask you if
11   you could tell me what those two pages are.
12   A    These look like they are a couple of pages out of
13   the package of data I received at the beginning of
14   investigating this incident.
15   Q    Who would you have received those materials from?
16   A    I suspect from Ralph Ridgeway.
17   Q    Do you know where he would have gotten them from?
18   A    Probably from Attorney Virgulto.
19   Q    Are those the type of documents that you would
20   typically rely on in preparing a report?
21   A    Are these the kinds of documents --
22   Q    That you would rely on as an expert.
23   A    I'm sorry, I didn't hear the question.  Yeah,
24   these are the sorts of things I would use in reviewing a

1   BY MR. SEIGER:
2       Q    Mr. Erikson, for purposes of this question, just
3   assume that the pour cup broke the way the plaintiffs'
4   counsel told you it did.
5       A    All right.
6       Q    Do you have an opinion that Mr. Graham's injuries
7   were a direct and proximate result of that breakage?
8       A    I have no opinion on injuries. That's outside
9   the scope of my investigation.
10      Q    And what you're saying is, you wouldn't have an
11  opinion that the breaking of the pour cup led to the
12  injuries that were sustained by Mr. Cuevas?
13      A    No.
14      Q    And the same would be true with respect to the
15  injuries sustained by Mr. Graham?
16      A    Yes.
17           MR. SEIGER:  Just give me a minute.
18           (DISCUSSION HELD OFF THE RECORD.)
19  BY MR. SEIGER:
20      Q    Mr. Erikson, do you have an opinion as to whether
21  or not the incident giving rise to the lawsuit that we're
22  here on was a direct and proximate result of the pour cup
23  breaking?
24           THE DEPONENT:  Could you repeat the

```
 1                    question?
 2                         (THE COURT REPORTER READ THE RECORD.)
 3        A      No, I do not.
 4                    MR. SEIGER:  No further questions at this
 5              time.
 6                    MR. VIRGULTO:  I'll be brief.
 7   CROSS-EXAMINATION
 8   BY MR. VIRGULTO:
 9        Q      Mr. Erikson, when you were retained to perform
10   the services that we're here discussing today, what was the
11   mandate given to you?
12        A      To examine the exemplar pouring cups provided and
13   determine if they could break in service.
14        Q      Okay.  And I believe it was Defendant's Exhibit
15   3, the folder which had the intake sheet from Ralph
16   Ridgeway; is that a fair characterization of the document?
17        A      Yes.
18        Q      Did that -- is this the document?
19        A      Yes.
20        Q      Okay.  And did this document fairly demonstrate
21   what that mandate was?
22        A      Yes.
23        Q      Were you asked to investigate the truth or the
24   voracity of the plaintiffs' respective claims?
```