UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT



* * * * * * * * * * * * * * * * * *

ALEXANDER GRAHAM and                    *

JOSE CUEVAS,                            *

         Plaintiffs          *    Civil No.:

    vs                              *    3:03 CV 990 (AWT)

FIRELINE, INC.,                         *

        Defendant            *

* * * * * * * * * * * * * * * * * *

DEPOSITION OF RAYMOND J. ERIKSON

Taken pursuant to Federal Rules of Civil Procedure 30
and 34, held at the law offices of EDWARDS & ANGELL,
90 State House Square, Hartford, Connecticut, before
Cynthia Trotta, a Registered Professional Reporter and
a Notary Public in and for the State of Connecticut, on
THURSDAY, MAY 27, 2004, at 10:10 a.m.

BEECHER & HORVATH

A P P E A R A N C E S :

ATTORNEY FOR THE PLAINTIFFS:

    MONGILLO, INSLER & VIRGULTO, P.C.
        26 Elm Street
        P.O. Box 415
        New Haven, Connecticut  06502
        BY:  THOMAS A. VIRGULTO, ESQ.

ATTORNEYS FOR THE DEFENDANT:

    EDWARDS & ANGELL, LLP
        90 State House Square
        Hartford, Connecticut  06103
        BY:  MARK B. SEIGER, ESQ.
            CHARLES F. GFELLER, ESQ.

ALSO PRESENT:

    TERRENCE D. NEUMEYER, Westfield Group

BEECHER & HORVATH

## S T I P U L A T I O N S

IT IS STIPULATED by the attorney for the Plaintiff and the attorney for the Defendant that each party reserves the right to make specific objections in open court to each and every question asked and the answers thereto given by the witness, reserving the right to move to strike out where applicable, except such objections as to the form of the question, which would be stated during the course of the deposition.

IT IS STIPULATED AND AGREED among counsel for the parties that the proof of the authority of the Notary Public before whom this deposition is taken is waived.

IT IS STIPULATED AND AGREED among counsel for the parties that the reading and the signing of the deposition is not waived.

IT IS STIPULATED AND AGREED TO among counsel for the parties that any defect as to the notice for the deposition is waived.

BEECHER & HORVATH

4

1        R A Y     E R I K S O N ,

2        having been first duly sworn by Cynthia Trotta, a Notary

3        Public in and for the State of Connecticut, testified

4        upon his oath as follows:

5

6    DIRECT EXAMINATION

7    BY MR. SEIGER:

8        Q    Mr. Erikson, as I introduced myself to you a

9    little while ago, I'm Mark Seiger, along with Charles

10   Gfeller; we represent Fireline in a case filed by Alexander

11   Graham and Jose Cuevas.

12        If there's any question I ask you today that you

13   don't understand, please let me know immediately so we can

14   rephrase that question because the purpose of today is to

15   get a clear record that's accurate and complete.  Okay?

16        A    I understand.

17        Q    All right.  I'm going to also ask that you try to

18   answer all questions verbally because "Uh-huhs," nods of the

19   head, shrugs of the shoulders, things like that, don't show

20   up on the transcript.  So we really need a verbal response,

21   and "Uh-huhs" are difficult to figure out what the witness

22   meant.  So if you could say "Yes" or "No" instead of

23   "Uh-huh" or "Uh-uh," that would be much better for us.

24        A    I understand.


BEECHER & HORVATH

1        Q       So your involvement was really with how do you

2    bond or better bond the tile to the shuttle itself?

3        A       That was part of it.   Another thing I worked on

4    was involvement of advanced felt, reuseable insulation,

5    which was really a misnomer because it was made out of

6    quartz silica fibers to place the Nomex felt and white tiles

7    on much of the shuttle, which we did on the -- to a little

8    bit on Challenger and then a much greater extent on later

9    shuttles.

10       Q       And are you an expert at this point in time with

11   respect to the design and manufacture of parts that are made

12   out of fused silica?

13       A       No, I wouldn't present myself as an expert.

14       Q       Are you an expert with respect to the processes

15   that are used to develop fused silica for parts that could

16   be used for any purpose?

17       A       No, I wouldn't present myself as an expert.

18       Q       Are you an expert with respect to fused silica in

19   the development of a pour cup such as the one involved in

20   this matter?

21       A       I wouldn't present myself as an expert in

22   designing pour cups, no.

23       Q       Would you be an expert with respect to the

24   manufacturing of pour cups such as the one involved in this

1    matter?

2        A    No.

3        Q    Are you an expert with respect to foundry

4    operations?

5        A    I wouldn't present myself as an expert in foundry

6    operations.

7        Q    Have you ever worked in a foundry similar to

8    Ansonia Copper & Brass?

9        A    I have not worked in a foundry similar to Ansonia

10    Copper & Brass, but I do have some foundry experience.

11        Q    Have you ever been to Ansonia Copper & Brass?

12        A    I have not.

13        Q    Have you ever been to a foundry similar to

14    Ansonia Copper & Brass?

15        A    I don't think I have ever visited a foundry that

16    used the kind of downcasting process that Ansonia employs in

17    producing their billets.

18        Q    Are you an expert with respect to the downcasting

19    used?

20        A    I would have to say that never having been in a

21    foundry that uses the downcasting process, the chances of my

22    being considered an expert are fairly slim.

23        Q    So then it would be fair to say that you're not

24    an expert with respect to the downcasting process used by

BEECHER & HORVATH

1    Ansonia Copper & Brass?

2        A    Yes, it would be fair to say that.

3        Q    Rather than go through all of your

4    responsibilities at your various employers, could you

5    describe for us any other employment that encompassed the

6    use of fused silica that you've had?

7        A    Well, fused silica might sound exotic and

8    technical, but it's really quite common.  It's employed in

9    all sorts of common materials and common processes, so I

10   would have to say that everything on my resume involved

11   fused silica at some extent.

12       Q    Could you tell us any experience that you have in

13   designing parts using fused silica?

14       A    Okay.  My most recent experience using fused

15   silica would have to be the optical elements on various

16   space craft.

17       Q    When was that?

18       A    It's a continuous.

19       Q    And what's your involvement with respect to those

20   optical elements?

21       A    There's a host of materials specification,

22   development, and processing issues that need to be addressed

23   in order to fly anything and that certainly applies to the

24   optical elements that form various sensor systems.

1    product, could that have an effect on the final product's

2    performance, and the answer is obviously yes.

3         Q    Do you know anything about the process used by

4    Fireline?

5         A    A little bit.

6         Q    You just know a little?  You don't know the

7    entire process?

8         A    I don't have their process specifications in

9    front of me.  I don't know exactly what they do.

10        Q    Is that something that's important to you in

11   rendering an expert opinion in the case?

12        A    It would be very helpful, yes.

13        Q    Helpful in what way?

14        A    Because as we've already discussed, the process

15   is a very large part of what produces the final product, the

16   process, the composition.

17        Q    So the process can have an impact on the

18   characteristics of the finished product?

19        A    Correct.

20        Q    And the ingredients can have an impact on the

21   final characteristics of the product?

22        A    Correct.

23        Q    And as you sit here today, you've rendered an

24   opinion in this case without knowing the process used by

45

1      A      I'm sure if we did go to court and I rendered my

2      opinion, that anything in error would be corrected by

3      Fireline's witnesses.

4      Q      Can you answer my question now?  I know you don't

5      want to, but can you answer it?

6      A      What's that?

7      Q      Would it be scientifically sound for you to go in

8      and render an opinion in this case before the judge before

9      you get this additional information?

10     A      That opinion is as sound as it can be based on

11     the information I have available to me to date.

12     Q      And what you're telling us, what you've already

13     testified is that to date you only have limited information?

14     A      Yes.

15     Q      And there's other information that is easily

16     obtainable that you should have before you go into court?

17     A      I don't know how easily obtainable it is.  I

18     think I requested those material and process specifications

19     way back at the beginning.  They were never provided.

20     Q      You requested those from plaintiffs' counsel?

21     A      I'm sure he submitted a request to you for that

22     information.

23     Q      Are you certain of that?

24     A      I'm sure he did.

BEECHER & HORVATH

48

1    there.  So that helps balance the flexure test against a

2    less ambiguous test.  Gives you better feel for what the

3    true strengths of the material are.  If possible, it would

4    be desirable to do a genuine tensile test on the material,

5    but that's always hard with ceramic.

6         Q    How would you go about doing that?

7         A    Well, that's always hard to say.  Tends to vary

8    from material to material as to what gives the best results

9    in tension because they are -- ceramics are so brittle.  You

10   have to hold them just right to get any kind of useful

11   tensile test data.  And there's all sorts of different ways

12   of doing that.  I'd have to run a number of different tests

13   which would give the most consistent tensile test results.

14        Q    Any other tests?

15        A    Should also do tests of the thermal properties.

16   That would involve doing some thermal conductivity testing,

17   which is obviously a large factor here, and some thermal

18   expansion testing, neither one of which is a trivial test.

19        Q    Why are the thermal properties of this cup

20   important to you?

21        A    Well, the magnitude of the stresses that develop

22   in the pouring cup are inextricably linked to the thermal

23   behavior of the material in the pouring cup.  In other

24   words, how fast the heat is conducted from the molten metal

63

1     A     No.

2     Q     So even based on your calculations, that pour cup

3  won't necessarily fail?

4     A     If you look at my report, you will see that I

5  have cited minimum values for strength from ASTM standard.

6  That doesn't mean that all pour cups are made to exactly

7  those minimum values.  In fact, chances are they're

8  generally much stronger than that.

9     Q     Well, this pour cup that we're using here that

10  was manufactured by Fireline, do you know what the strength

11  of it is?

12     A     I do not.

13     Q     Did you do any calculations --

14     A     You can't calculate strength.

15     Q     So all you're telling us in your expert opinion

16  is that if we look at the minimum value set out by ASTM, and

17  we assume that this pour cup only has the minimum values

18  that ASTM has specified, this pour cup will fail?

19     A     That is correct.

20     Q     So you're not telling us that this pour cup

21  failed because it didn't have sufficient strength?

22     A     Obviously, if it failed, it did not have

23  sufficient strength.

24     Q     Okay.  Well, you don't even know that this pour

BEECHER & HORVATH

1     cup failed that's involved in this case; isn't that correct?

2          A     I believe that was the whole gist of this

3     argument here.

4          Q     Well, let's start with some basics.  Do you have

5     the actual pour cup that was involved in this incident?

6          A     No, I do not.

7          Q     And did you interview either of the plaintiffs in

8     this case?

9          A     No.

10         Q     Did you think it was important to talk to either

11    of them?

12         A     It would have been nice.

13         Q     Did you ever tell plaintiffs' counsel that you'd

14    like to talk to them?

15         A     They did give very complete statements.  That

16    wasn't a real high priority compared to getting more

17    materials information.

18         Q     Well, let's make it simple for you.  Did either

19    of the two plaintiffs in this case, either Mr. Graham or Mr.

20    Cuevas, say that they saw the bottom of the pour cup fall

21    out?

22         A     I couldn't say with certainty that there's

23    something in their testimony to that effect, but that was

24    the impression I had.

1      Q     Would you be surprised or would it impact your

2  opinion in any way if both of them didn't observe any

3  failure in the pour cup at the time the pour was taking

4  place?

5      A     Well, that would tend to render all of this

6  somewhat meaningless now, wouldn't it?

7      Q     So you would be surprised to learn that, and it

8  would impact your opinion in this case?

9      A     Yes.

10     Q     So if this pour cup -- if the bottom fell out,

11  that would have been readily observable by the operator?

12     A     I don't know that that's true.

13     Q     Well, let's take a look at something else that

14  you talk about in your report, and that is you talk about --

15  let me get the specific term here.  You made a determination

16  that the bottom of the pour cup was much less dense than the

17  metal that was being poured.

18     A     Yes.

19     Q     And you've got the density of the pour cup at

20  1.95 grams per cc.s?

21     A     Correct.

22     Q     And you've got the density of the metal at 8.75

23  grams per cc.s?

24     A     Yes.

1    between the inside wall of the pour cup and the outside wall

2    of the pour cup, you recognize that there are a number of

3    factors that can influence how fast that heat exchange

4    takes?

5         A    Yes.

6         Q    And as you sit here today, you don't know what

7    effect those other factors would have as regards to that

8    heat transfer between the inside wall of the pour cup and

9    the outside wall of the pour cup?

10        A    Well, I know what effect each factor would have.

11    I just don't know what the magnitude of those effects are.

12        Q    And what would you have to do to determine the

13    magnitude of those effects?

14        A    I would have to have -- well, okay.  The simplest

15    way to determine what the temperature gradient is between

16    the inside and outside is simply place a thermal cup on

17    outside of pouring cup while metal is being poured through

18    it.  Just measure it.  Short of that, I would have to gather

19    more materials property data and build a more sophisticated

20    math model.

21        Q    Let's go back to your report, and you can open

22    page 3 of that report, which is your analysis.  And on page

23    3, the analysis starts off with this statement, "There are a

24    number of ways a direct, hyphen, chill, paren., DC, close-

BEECHER & HORVATH

1    paren., billet casting operation can go awry."

2            And I take it that what you were trying to do was

3    lay out alternative causes for what happened to the

4    plaintiffs in this case?

5    A        Yeah.  These are some of the ways that saw that

6    you could have the results that were observed develop.

7    Q        All right.  And when you say "the results that

8    were observed," you're talking about the molten metal

9    spraying out and getting on these individuals?

10   A        I wasn't so concerned about the personnel side of

11   the equation as to just how the metal would get out of the

12   pouring operation in the first place.

13   Q        Okay.  And did you list these in any type of

14   order that would indicate a significance to the way you

15   listed them?

16   A        You mean a higher probability of occurrence?

17   Q        Correct.

18   A        No.

19   Q        And are there additional ways this could have

20   occurred other than the seven ways you've listed here on

21   page 3?

22   A        I've endeavored to be comprehensive, but I'm sure

23   there's some other way that a system can fail that I haven't

24   listed.

BEECHER & HORVATH

1      Q      Okay.  And what you then say is, "However, the

2   distribution of the molten metal in the mold would change

3   significantly since four separate streams of metal

4   previously direct to the sides of the mold would become a

5   single large stream directed to the middle of the mold."

6            So what you're talking about, rather than coming

7   out the sides, it's now going straight down the center?

8      A      Correct.

9      Q      And without doing testing and actually trying to

10  have a bottom of the pour cup fall out and see what the

11  effect would be, you don't know whether or not that could

12  actually cause what happened to the plaintiffs in this case?

13     A      No, I don't know with absolute certainty what

14  happened there.  I wasn't there.

15     Q      Well, not only don't you know with certainty, not

16  having run that type of a test to see what the effect would

17  be, if a bottom fell out towards the end of a pour, you

18  don't know what would happen at all; it would be guessing?

19     A      Yes.

20     Q      So even if the pour cup had failed as the

21  plaintiffs claim, you don't know that that could have caused

22  the injuries that they allegedly sustained?

23     A      Not with certainty.

24     Q      And as we sit here today, I guess you have -- if

1    to an expert opinion in this case regarding a failure of the

2    pour cup being the proximate cause or a proximate cause of

3    this injury?

4         A    I already have issued an expert opinion.  What

5    that kind of testing and analysis would do is tend to either

6    verify or not verify my current opinion.

7         Q    But your current opinion here is that the pour

8    cup was made out of the wrong material?  You didn't render

9    an opinion as to the proximate cause of the injuries because

10   you don't know what actually caused it from what you've just

11   testified to?

12        A    No, I didn't say that that was the proximate

13   cause.  I said that is a possible cause, loss of the cup

14   bottom, item 3 under "Findings."

15             "Loss of the cup bottom can lead to the

16   disruption of the metal freezing process."

17        Q    And with respect to No. 3 of your findings, which

18   is on page 5, in order to determine whether or not the loss

19   of the bottom of the pour cup could actually result in the

20   injuries sustained by the plaintiffs, you would need to do

21   some type of experiments to find out what effect the bottom

22   of the pour cup coming off would have on the pour process?

23        A    The only way to determine with certainty that

24   what effect the loss of the pour cup bottom would have on

BEECHER & HORVATH

```
 1        A      Yes, I think we'd want to see how the metal

 2    leaked out of the billet under those circumstances, if it

 3    led to splattering molten metal and the cooling water and so

 4    forth and what sort of spray pattern you got and how likely

 5    it would be that --

 6                      (INTERRUPTION IN THE PROCEEDINGS.)

 7        A      -- how likely it would be that that sort of spray

 8    pattern would lead to injuries, I suppose.

 9        Q      Have you recommended that that type of testing be

10    done in this case?

11        A      No, not that far along in investigating this.

12        Q      Would it be fair to say that you would consider

13    yourself to be at the initial phases of this investigation

14    or the early stages?

15        A      That would be fair to say.

16        Q      As you sit here today, do you have any plans to

17    conduct additional testing or investigation in this matter?

18        A      I've outlined some things that could be done.

19        Q      Is that the outline that you've provided by way

20    of Exhibit 4, the letter dated November 3 of 2003?

21        A      Yes.

22        Q      And to date you haven't been granted authority to

23    do any of that testing, have you?

24        A      That's correct.
```

BEECHER & HORVATH

1      Q     But did you do any testing to determine what the

2    results would be if the cup broke?

3      A     I haven't done any testing.  Have you?

4      Q     The answer is no, you haven't done any testing,

5    correct?

6      A     That's correct.

7      Q     So as you sit here today, you have nothing more

8    than just a hypothesis that a broken cup may have brought

9    about this injury or may have been the proximate cause of

10   the injury?

11     A     Yes, that's one possibility.

12     Q     And there are several other possibilities?

13     A     There are other possibilities.

14     Q     Did anybody ever ask you to determine which would

15   be the more likely possibility of the other possibilities

16   that you've come up with?

17     A     No, I don't think so.

18     Q     So that's never been part of your assignment?

19     A     No.  I think the statement at work there on the

20   data sheet keys it up very succinctly.

21     Q     So the answer to my question would be that was

22   not part of the assignment question?

23     A     I'm not being asked to determine -- I'm not being

24   asked to focus blame on anybody.  That's the attorney's job.

128

1    BY MR. SEIGER:

2        Q    Mr. Erikson, for purposes of this question, just

3    assume that the pour cup broke the way the plaintiffs'

4    counsel told you it did.

5        A    All right.

6        Q    Do you have an opinion that Mr. Graham's injuries

7    were a direct and proximate result of that breakage?

8        A    I have no opinion on injuries.  That's outside

9    the scope of my investigation.

10        Q    And what you're saying is, you wouldn't have an

11    opinion that the breaking of the pour cup led to the

12    injuries that were sustained by Mr. Cuevas?

13        A    No.

14        Q    And the same would be true with respect to the

15    injuries sustained by Mr. Graham?

16        A    Yes.

17            MR. SEIGER:  Just give me a minute.

18            (DISCUSSION HELD OFF THE RECORD.)

19    BY MR. SEIGER:

20        Q    Mr. Erikson, do you have an opinion as to whether

21    or not the incident giving rise to the lawsuit that we're

22    here on was a direct and proximate result of the pour cup

23    breaking?

24            THE DEPONENT:  Could you repeat the

1          question?

2              (THE COURT REPORTER READ THE RECORD.)

3     A    No, I do not.

4              MR. SEIGER:   No further questions at this

5          time.

6              MR. VIRGULTO:   I'll be brief.

7     CROSS-EXAMINATION

8     BY MR. VIRGULTO:

9     Q    Mr. Erikson, when you were retained to perform

10    the services that we're here discussing today, what was the

11    mandate given to you?

12    A    To examine the exemplar pouring cups provided and

13    determine if they could break in service.

14    Q    Okay.  And I believe it was Defendant's Exhibit

15    3, the folder which had the intake sheet from Ralph

16    Ridgeway; is that a fair characterization of the document?

17    A    Yes.

18    Q    Did that -- is this the document?

19    A    Yes.

20    Q    Okay.  And did this document fairly demonstrate

21    what that mandate was?

22    A    Yes.

23    Q    Were you asked to investigate the truth or the

24    voracity of the plaintiffs' respective claims?

BEECHER & HORVATH